765 F.2d 412
 118 L.R.R.M. (BNA) 2728, 102 Lab.Cas. P 11,361,
6 Employee Benefits Ca 1823
 DISTRICT 17, DISTRICT 29, LOCAL UNION 7113, AND LOCAL UNION
6023, UNITED MINE WORKERS OF AMERICA; and John
Ramey and Joseph McCardle on behalf of
themselves and others
similarly situated, Appellees,
v.
ALLIED CORPORATION, Appellant
and
Armco, Inc.; Shannon Pocahontas Coal Co., corporations;
and the United Mine Workers of America 1974
Benefit Plan and Trust, Defendants.
DISTRICT 17, DISTRICT 29, LOCAL UNION 7113, AND LOCAL UNION
6023, UNITED MINE WORKERS OF AMERICA; John Ramey
and Joseph McCardle on behalf of
themselves and others
similarly situated, Appellees,
v.
ARMCO, INC., Appellant,
and
Allied Corporation; Shannon Pocahontas Coal Co.,
corporations and the United Mine Workers of
America 1974 Benefit Plan and Trust, Defendants.
DISTRICT 17, DISTRICT 29, LOCAL UNION 7113 AND LOCAL UNION
6023, UNITED MINE WORKERS OF AMERICA; John Ramey
and Joseph McCardle, on behalf of
themselves and others
similarly situated, Appellees,
v.
SHANNON POCAHONTAS COAL CO., Appellant,
and
Allied Corporation, Armco, Inc., corporations and the United
Mine Workers of America 1974 Benefit Plan and
Trust, Defendants.
DISTRICT 17, DISTRICT 29, LOCAL UNION 7113 AND LOCAL UNION
6023, UNITED MINE WORKERS OF AMERICA; John Ramey
and Joseph McCardle on behalf of
themselves and others
similarly situated, Appellants,
v.
ALLIED CORPORATIONS, Armco, Inc., Shannon Pocahontas Coal
Co., corporations and the United Mine Workers of
America 1974 Benefit Plan and Trust, Appellees.
 Nos. 83-1117(L), 83-1210 to 83-1212.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 2, 1984.
Decided Feb. 11, 1985.
Certiorari Denied July 1, 1985.
 
 See 105 S.Ct. 3527.
 Willis J. Goldsmith, Washington, D.C. (Deborah Crandall, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., Charles L. Woody, Spilman, Thomas, Battle & Klostermeyer, Charleston, W. Va, Paul M. Thompson, Gregory B. Robertson, Richmond, Va., Hunton & Williams, Washington, D.C., on brief), for appellants.
 Daniel B. Edelman, Washington, D.C. (Yablonski, Both & Edelman, Washington, D.C., Michael H. Holland, Deborah Stern, Washington, D.C., Webster J. Arceneaux, III, Grant Crandall, Crandall, Pyles & Crandall, Charleston, W.Va., on brief) and William F. Hanrahan, Gen. Counsel, Washington, D.C. (Mary Anne Gibbons, Associate Counsel, Washington, D.C., on brief) for appellees.
 Before WINTER, Chief Judge, and WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN, CHAPMAN and WILKINSON, Circuit Judges.*
 SPROUSE, Circuit Judge:
 
 
 1
 The defendants, Allied Corporation, Armco, Inc., and Shannon Pocahontas Coal Company appeal the district court's injunction requiring Allied to provide health and other non-pension benefits (benefits) to some 190 of its retired coal miners unless and until Allied can negotiate the provision of these benefits by Armco and Shannon Pocahontas, the corporations that acquired from Allied the coal mines that employed the miners prior to their retirement. The plaintiffs, District 17, District 29, Local Union 7113, and Local Union 6023 of the United Mine Workers of America (UMWA), and John Ramey and Joseph McCardle[1] appeal that part of the district court's judgment which found that the fourth defendant, the miners' 1974 Benefit Plan & Trust (1974 Benefit Trust), was not responsible for the payment of benefits to the retired miners.
 
 
 2
 A three-judge panel of this court, in a divided opinion reversing the district court, absolved Allied of any liability and held that the 1974 Benefit Trust was responsible for the payments to the retirees.[2] After an en banc hearing, we now affirm the district court's decision that Allied must provide the benefits to the retirees, and that the 1974 Benefit Trust is not responsible for such benefits.
 
 I.
 
 3
 The UMWA and many American coal mine owners have operated for many years under a master collective bargaining agreement such as the one involved in this dispute. The union and the Bituminous Coal Operators Association (BCOA) renegotiate it every three years. The three defendant corporate mine owners have been parties to several of these contracts; this suit focuses on obligations arising out of the 1978 agreement.
 
 
 4
 These collective bargaining agreements, for many years prior to 1974, have contained provisions for payment of benefits to active and retired miners.[3] The 1974 agreement created the 1974 Benefit Trust to provide such benefits to union miners receiving benefits under the 1974 pension plan or, in some cases, under any successor plans. The owners paid into the Trust a royalty on each ton of coal produced and on each hour's wage paid to a union employee. From this Trust the Trustees paid medical, hospitalization, and other expenses on behalf of retired miners.
 
 
 5
 A protracted strike occurred in 1977 when the 1974 agreement expired. BCOA's insistence that the 1974 Benefit Trust be abolished was a principal issue. The bargaining parties finally resolved that difference in 1978 by agreeing to an alternative: each signatory employer would provide, through its own insurance carrier, health and other non-pension benefits for its own union employees. They further agreed that the last signatory employer, or its successor, of a retired miner would provide the benefits to the retiree. Absent such employer or successor, the 1974 Benefit Trust would furnish the benefits.[4] The collective bargaining agreements of 1981 and 1984 continued the 1974 Benefit Trust under essentially the same terms.
 
 
 6
 Until March 1980, Allied owned and operated, among its many corporate enterprises, the Harewood and Shannon Branch coal mines in West Virginia. It was a signatory to the 1978 collective bargaining agreement which was due to expire on March 27, 1981. In early 1980, however, it withdrew from the business of mining coal and sold both mines--its Harewood mine to Armco and its Shannon Branch mine to Vera Mining Company, now called Shannon Pocahontas.[5] Both purchasing companies, like Allied, were signatories to the 1978 agreement;[6] and both Armco and Shannon Pocahontas, in later years, signed the 1981 collective bargaining agreements. Because Allied was no longer in the coal business, it was a party to neither the 1981 nor 1984 contracts.
 
 
 7
 The transfer agreements between Allied and Armco and Shannon Pocahontas provided that the corporate buyers would not assume any of Allied's obligations except those specifically provided for in those agreements.[7] Allied did not require Armco and Shannon Pocahontas to assume its obligations under Article XX of the 1978 contract to provide benefits to the retired miners involved in the instant case. Instead, Allied continued to provide the benefits to the retirees for almost sixteen months after the execution of the 1981 collective bargaining contract by Armco, Shannon Pocahontas and other members of the BCOA, specifically until September 29, 1982.[8]
 
 
 8
 In August 1982 the retired miners requested from the Trustees of the 1974 Benefit Trust a determination as to whether they were eligible to receive health benefits from the Trust. The Trustees ruled that Article XX defined beneficiaries of the 1974 Benefit Trust as only those retirees whose last employer and its successor, if any, were no longer in business. Although the Trustees found that Allied was "no longer in business," they determined that Armco and Shannon were "successors" still in business. Therefore, the 1974 Benefit Trust could not pay benefits to the retired miners.
 
 
 9
 The parties contend below and on appeal as follows. Allied, Armco, and Shannon Pocahontas argue that Allied is not responsible for providing the benefits after the expiration of the 1978 agreement on March 27, 1981 and that neither Armco nor Shannon Pocahontas is responsible because each specifically contracted with Allied not to assume these obligations. All three companies urge that the 1974 Benefit Trust should pay the benefits directly to the retired miners who are parties to this action. The Trust, of course, denies liability and contends that Allied is responsible for the retirees' benefits. The union and the retirees contend that each of the companies is liable and, alternatively, that the 1974 Benefit Trust is liable.
 
 
 10
 The district court held that the 1974 Benefit Trust was not responsible but that the companies, under several theories, were responsible for payment of the benefits. The district court issued an injunction requiring Allied to provide the benefits unless and until Allied secures the agreement of Armco and Shannon Pocahontas to provide them. We first consider whether the Trustees of the 1974 Benefit Trust were wrong in refusing to provide benefits to the retired miners.
 
 II
 
 11
 The 1974 Benefit Trust's purpose is to provide health and other non-pension benefits to pensioners who retired under the 1974 pension plan, or any successor plan, and whose last known employer, including any successor, is no longer in the coal-mining business. Article XX of the 1978 collective bargaining agreement provides in pertinent part:
 
 
 12
 (c)(3)(iii) The 1974 Benefit Plan and Trust shall continue after May 31, 1978, for the sole purpose of providing health and other non-pension benefits, during the term of this Agreement, to any retired miner under the 1974 Pension Plan or any successor plan(s) thereto who would otherwise cease to receive the health and other non-pension benefits provided herein because the signatory Employer (including successors and assigns) from which he retired is no longer in business.
 
 
 13
 The 1974 Benefit Trust empowers the Trustees to interpret the provisions of the Trust.[9] Pursuant to that authority, the Trustees in July 1978, more than three years prior to this suit, defined the terms "no longer in business" and "successor"--definitions critical to the resolution of this dispute. Essentially, they ruled that a company is no "longer in business" when it "has not received income from the production or sale of coal, or transportation of coal, or related activities for at least six months."
 
 
 14
 In defining "successor," the Trustees stated that a successor exists for the purpose of deciding the 1974 Benefit Trust's liability if the purchaser (1) signs the 1978 collective bargaining agreement, (2) draws a majority of its employees from the seller, (3) operates at the same geographical location performing essentially the same job functions, (4) has not suspended its operations for more than six months, and (5) either acquires a substantial portion of the seller's assets or is owned and operated by the same persons controlling the seller.
 
 
 15
 In 1982 the Trustees, in denying benefits to the approximately 190 retirees involved in this appeal, found that Allied, although no longer in business itself because it had not received any income from coal for at least six months, sold its operations to firms meeting the successor criteria. The Trustees, in determining that Armco and Shannon Pocahontas are successors, found that the majority of the employees of Armco and Shannon Pocahontas were previously employed by Allied. Armco employed 159 former Allied workers in its 215-person work force, and Shannon Pocahontas employed 298 former Allied workers in its 401-person work force. The Trustees' opinion also explicitly stated that Allied "transferred most of the assets of its mines" to Armco and Shannon Pocahontas. Furthermore, the Trustees found that Armco and Shannon Pocahontas were signatories to the 1978 agreement and that there was no significant hiatus or change in the operation of the mines after the transfer. The Trustees, therefore, ruled that because Armco and Shannon Pocahontas are successors still mining at the locations purchased from Allied, the 1974 Benefit Trust agreement prevented the Trust from paying the retirees' benefits.
 
 
 16
 Trustees of a trust fund enjoy wide discretion in determining eligibility for benefits under their trust. In order to overturn this ruling of the Trustees, we must find that they acted arbitrarily or capriciously. Maggard v. O'Connell, 671 F.2d 568, 570-71 (D.C.Cir.1982); Seafarers Pension Plan v. Sturgis, 630 F.2d 218, 221 (4th Cir.1980); Pete v. UMWA Welfare & Retirement Fund of 1950, 517 F.2d 1275, 1283 (D.C.Cir.1975) (en banc); Gomez v. Lewis, 414 F.2d 1312, 1314 (3d Cir.1969); KOLATA v. UMWA 1974 Pension Trust, 533 F.Supp. 313, 318-19 (S.D.W.Va.), aff'd, 696 F.2d 990 (4th Cir.1982); Snyder v. Titus, 513 F.Supp. 926, 932 (E.D.Va.1981). Here, the instrument creating the Trust expressly empowered the Trustees to interpret it. They defined the critical terms used in Article XX in July 1978, long before this controversy arose. The Trustees meticulously followed the Trust's rules and procedures in defining terms and in deciding the retirees' eligibility for benefits, and its substantive conclusion concerning the successorship status of Armco and Shannon Pocahontas was reasonable. In these circumstances, the Trustees' denial of benefits was anything but arbitrary or capricious, and we affirm the district court's ruling to that effect. We now turn to the companies' contention that the district court erred in issuing the injunction requiring Allied to continue the benefit payments.
 
 III
 
 17
 Under the 1978 agreement, coal mine operators, including Allied, agreed to provide health and other non-pension benefits to retired miners who last worked for signatory coal employers. Specifically, Article XX provided in pertinent part:
 
 
 18
 (c)(3)(i)... each signatory Employer shall establish an Employee benefit plan to provide, implemented through an insurance carrier(s), health and other non-pension benefits for its Employees covered by this Agreement as well as pensioners, under the 1974 Pension Plan and Trust, whose last classified employment was with such Employer. The benefits provided pursuant to such plans shall be guaranteed during the term of this Agreement by each Employer at levels set forth in such plans.
 
 
 19
 Although this obligation existed only for the life of the 1978 contract, which expired in 1981, it was perpetuated in the 1981 and 1984 contracts.
 
 
 20
 Superficially, it might appear that none of the defendants is liable for the retirees' benefits. Because Allied had withdrawn from the coal business in 1980 it was not a signatory to the 1981 contracts. Armco and Shannon Pocahontas, on the other hand, although signatories to the 1978 and 1981 contracts, agreed with Allied when they individually acquired the two mines in 1980 that they would not assume the obligations to pay benefits to Allied's retirees. In creating the 1974 Benefit Trust, the union and the coal operators anticipated a successor scenario and agreed that, under such circumstances, the 1974 Benefit Trust could not assume responsibility for payment of the benefits.
 
 
 21
 If that were the complete picture, the answer to this dispute simply would be that after expiration of the 1978 agreement on March 27, 1981, no one had a duty to provide the retired miners with the disputed benefits. The agreement, however, also anticipated that operators might withdraw from the coal business and, by Article I, obligated the seller of a coal mine to require the purchaser to assume the seller's obligations under the agreement. Article I provides in pertinent part:
 
 
 22
 In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement.
 
 
 23
 It is clear that Allied breached Article I of the agreement when it agreed with Armco and Shannon Pocahontas that the latter, as successors, would not assume Allied's obligations under the 1978 agreement. In the face of this obvious breach of contract, however, we confront the more difficult problems of identifying the damage to the retirees and considering an appropriate remedy. The companies argue that Allied was obligated to pay only until 1981 and in fact paid until 1982 and that, even if it had obtained the agreement of Armco and Shannon to assume its obligations to pay health benefits to retirees, those obligations would have expired in 1981. The companies further argue that as of the purchase date the renegotiation and continuation of the benefits in future contracts was speculative at best. These arguments overlook both the nature of the underlying principles of law and the nature of Allied's obligations under the 1978 contract.
 
 
 24
 While the companies acknowledge that a collective bargaining agreement is controlled by the "common law of collective bargaining," they argue only orthodox contract rules in advancing their view of the appropriate resolution of this dispute. They would have us go through the facile, but inutile, exercise of determining when Allied's obligations under the 1978 collective bargaining agreement expired rather than inquiring into the damages for Allied's breach while the contract was still operative.
 
 
 25
 In the first place, even under rules for interpreting ordinary commercial contracts we might well find that the damages to the retired miners were foreseeable in 1980 after the contract was breached and that the remedy fashioned by the district court was appropriate to rectify the injury. It is not necessary, however, to resolve this principal issue in the context of rules of traditional contract law that do not control the relationship between these parties.
 
 
 26
 The Supreme Court long ago recognized that collective bargaining agreements were not to be interpreted under traditional rules of contract but under a federal common law of collective bargaining. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). The Court held that collective bargaining agreements could not be pigeon-holed into a division of law that does not meet the interpretive necessities of labor agreements born of industrial relationships. In Lincoln Mills, the Court, in a historic decision recognizing that an agreement between parties to an industrial dispute is not an ordinary contract, said:
 
 
 27
 The question then is, what is the substantive law to be applied in suits under Sec. 301(a)? We conclude that the substantive law to apply in suits under Sec. 301(a) is federal law which the courts must fashion from the policy of our national labor laws. The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. Federal interpretation of the federal law will govern, not state law. But state law, if compatible with the purpose of Sec. 301, may be resorted to in order to find the rule that will best effectuate the federal policy. Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights.
 
 
 28
 It is not uncommon for federal courts to fashion federal law where federal rights are concerned. Congress has indicated by Sec. 301(a) the purpose to follow that course here.
 
 
 29
 Lincoln Mills, 353 U.S. at 456-57, 77 S.Ct. at 918 (citations omitted).
 
 
 30
 In United Steelworkers v. Warrior & Gulf Navigation Company, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), the Court elaborated on the differences between collective bargaining agreements and ordinary contracts, differences which give rise to the former's special treatment under federal labor law.
 
 
 31
 When most parties enter into contractual relationship they do so voluntarily, in the sense that there is no real compulsion to deal with one another, as opposed to dealing with other parties. This is not true of the labor agreement. The choice is generally not between entering or refusing to enter into a relationship, for that in all probability pre-exists the negotiations. Rather it is between having that relationship governed by an agreed-upon rule of law or leaving each and every matter subject to a temporary resolution dependent solely upon the relative strength, at any given moment, of the contending forces.
 
 
 32
 Id.; see also Wiley & Sons v. Livingston, 376 U.S. 543, 550-51, 84 S.Ct. 909, 914-15, 11 L.Ed.2d 898 (1964).
 
 
 33
 Six years later, the Supreme Court, in Transportation-Communication Employees Union v. Union Pacific Railroad Company, 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966), provided further guidance for interpreting collective bargaining agreements. "In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements." Id. at 159-61; 87 S.Ct. at 370-71; see also Kemmis v. McGoldrick, 706 F.2d 993, 996 (9th Cir.1983).
 
 
 34
 Federal appeals courts have, of course, uniformly followed the Lincoln Mills lead in dealing with contractual problems peculiar to industrial disputes. In Capitol-Husting Co., Inc. v. NLRB, 671 F.2d 237 (7th Cir.1982), the Seventh Circuit considered whether there had been an offer and acceptance of a collective bargaining agreement where there had been neither a written nor a specific oral acceptance. The Court found an agreement from the bargaining conduct of the parties, stating:
 
 
 35
 Reasoned flexibility in the application of contract law to the field of labor relations is necessary to fully effectuate the policies underlying federal labor law. The Supreme Court has recognized that "a collective bargaining agreement is not an ordinary contract." In Pepsi-Cola Bottling Co. v. N.L.R.B., the [Eighth Circuit] discussed why common law contract rules do not exclusively govern the collective bargaining setting.
 
 
 36
 In contrast [to the rules of common law contract], the National Labor Relations Act compels the employer and the duly certified union to deal with each other and to bargain in good faith. Upon rejection of an offer, the offeror may not seek another contracting party.
 
 
 37
 Id. at 242 (citations omitted) (quoting Pepsi Cola Bottling Co. v. NLRB, 659 F.2d 87, 89 (8th Cir.1981)); cf. Kemmis v. McGoldrick, 706 F.2d 993 (usual principles of oral modification of a written contract do not necessarily apply to a collective bargaining agreement.)
 
 
 38
 Federal circuit courts likewise have applied the Lincoln Mills rationale in deciding issues of damages and remedies. In Richardson v. Communications Workers of America, 443 F.2d 974 (8th Cir.1971), the Eighth Circuit in determining future damages for discrimination and wrongful discharge where the collective bargaining agreement expired six months after the plaintiff's discharge, stated:
 
 
 39
 The expiration date of a bargaining contract does not place the employee in jeopardy of losing his job at the termination of the agreement. In fact one of the very incentives to union representation is job security. The employee, the union which represents him, the company which employs him, each contemplate a "subsisting" contractual relationship for an indefinite period of time. This is particularly true in established industries where continual dealings with a recognized union foster renewals and renegotiations. Furthermore, the employee, the union and the company are placed on notice that even after the bargaining agreement terminates the rights and obligations of the parties continue under the umbrage of the National Labor Relations Act. The obligation of the parties to bargain for new contracts is written into law. The company cannot exercise unilateral action detrimental to fair bargaining.
 
 
 40
 In view of the character of work here involved, the time the plaintiff had been with the company, the strong likelihood of his future employment with the company, the probability of renewal of the collective bargaining agreement, the severance of seniority rights, we deem future damages extending beyond the date of any collective bargaining agreement recoverable under Sec. 301. We thus conclude that it was error to limit plaintiff's damage by the expiration date of the collective bargaining agreement.
 
 
 41
 Id. at 978-80 (citations omitted); see also Thompson v. Brotherhood of Sleeping Car Porters, 367 F.2d 489 (4th Cir.1966) (seniority rights do not necessarily terminate at the expiration of the collective bargaining agreement; federal courts must fashion effective remedies for the impairment of federally created rights in the field of labor relations).
 
 
 42
 The Third Circuit has approved a similarly expansive approach to damages and remedies for breach of a collective bargaining agreement. In Local 127, United Shoe Workers v. Brooks Shoe Manufacturing Company, 298 F.2d 277 (3rd Cir.1962) (en banc), the court awarded damages to a local union as a result of a company abandoning its contracts and relocating elsewhere. Despite the employer's argument that the union's damages for loss of dues should be limited to the dues that would have been paid during the term of the contract that was breached, the court affirmed the district court's award of future damages calculated on the basis of contract renewals for twenty years. Relying on the above quoted language from Lincoln Mills, the plurality of the court stated:
 
 
 43
 The bounds within which a federal court can travel in fashioning a remedy in an action under Sec. 301(a) are far apart but well marked since the Supreme Court's decision in Textile Workers Union of America v. Lincoln Mills.
 
 
 44
 ....
 
 
 45
 ... There is no basis in the record for concluding that repeated contracts would not have been successfully negotiated between the company and the union, and it has never been suggested that the union did not represent a majority of the employees, nor has an election ever been sought for selection of a new bargaining representative.
 
 
 46
 Id. at 281-82 (citations omitted).
 
 
 47
 We must examine whether the district court fashioned an appropriate remedy for Allied's breach of the 1978 agreement under this body of modern federal law, utilizing only those rules of traditional contract law that fit the mold prescribed by the Supreme Court and that "effectuate the policy which underlies federal labor legislation." Seymour v. Hull & Moreland Engineering, 605 F.2d 1105, 1109 (9th Cir.1979).
 
 
 48
 Coal operators for many years have agreed to pay and have paid health benefits to miners. Prior to 1978, coal operators provided health benefits through an industry-wide trust fund. In a historic development in 1978, each company signatory to the 1978 collective bargaining contract agreed to provide benefits through its own insurance carrier, rather than through a trust fund. Virtually the same agreement was executed in 1981 and 1984 during the periodic renegotiation of the expired contract.
 
 
 49
 There is no evidence that Allied was acting in bad faith when it continued to pay the benefits after it left the coal business and until after the 1981 contract was negotiated. We attribute none.
 
 
 50
 Nonetheless, if Allied had complied with its contractual obligations and required Armco and Shannon Pocahontas to assume the disputed benefit obligations, it is obvious that the UMWA would have insisted that the latter two employers bargain concerning the continuation of this coverage in succeeding contract talks. If Allied had not breached the 1978 contract, the complaining retirees very probably would have been covered by Armco and Shannon Pocahontas until the expiration of the 1984 contract and thereafter as long as those corporations or their successors were in the business of mining coal and employing union coal miners.
 
 
 51
 Allied's breach occurred in 1980 when it transferred the mines to Armco and Shannon Pocahontas without passing on all of its obligation as required by Article I of the 1978 collective bargaining agreement. Viewing its breach at that time, the consequences of the breach were easily foreseeable. Since at least 1950, in each bargaining year, the signatory employers renewed their agreement in one form or another. The insistence of the UMWA in bargaining for the continuation of the health and other non-pension benefits of retirees is written in the history of at least four contracts, including the one presently in effect. Loss of benefits to the retired miners by Allied's actions was more certain than the loss of dues in United Shoe and the loss of earnings in Richardson. We must assume that Allied knew the consequences of selling its mines without requiring its successors to assume its obligations--namely, that its actions would leave the retirees without coverage and with no responsible employer against whom the UMWA could make contract demands at the next round of bargaining. Under these circumstances, a federal court appropriately may look to Lincoln Mills and Warrior & Gulf, as well as circuit court decisions such as Richardson and United Shoe, to determine an appropriate remedy.
 
 
 52
 The district court, in fashioning a remedy to effectuate the policies underlying the federal common law of collective bargaining, issued an injunction requiring Allied to continue to provide benefits to the retired miners until it secured agreements from Armco and Shannon Pocahontas to assume those obligations. The remedy fashioned by the district court here is in the same mold as that fashioned by the courts in United Shoe and Richardson and follows the dictates of Lincoln Mills. The district court found that Armco and Shannon also could be liable for the payments regardless of the disclaimer in their purchase agreements, reasoning that as signatories to the 1978 agreement, they also were bound by Article I's successor provision. We need not wander into that thicket or consider the effect of the "hold harmless" clauses in the transfer agreements. We review only the propriety of the district court's injunction and affirm that action. We note, moreover, that the damage consequential to Allied's breach can flow only as long as there is a successor coal mine employer in its chain of transfer who agrees to continue the coverage. Should those circumstances change, or should other circumstances change which might affect the parties' relationships, Allied may apply to the district court for modification or dissolution of the injunction.[10]
 
 
 53
 In view of the above, it is not necessary to discuss the alternative reasons announced by the district court for issuing the injunction, namely: that Allied violated the requisite "care, skill, prudence and diligence" imposed upon it by the Employees Retirement Income Security Act, 29 U.S.C. Sec. 1104(a)(1)(B), and that it was estopped from paying the benefits by its conduct in continuing to pay them beyond the expiration of the 1978 agreement.
 
 The decision of the district court is
 
 54
 AFFIRMED.
 
 CHAPMAN, Circuit Judge, dissenting:
 
 55
 I respectfully dissent for the reasons set forth in the majority opinion of the original three-judge panel in this case, which opinion is reported at 735 F.2d 121.
 
 
 56
 I am authorized to say that Judge WIDENER, Judge JAMES DICKSON PHILLIPS and Judge WILKINSON join in this opinion.
 
 
 
 *
 Judge Russell did not participate
 
 
 [1]
 John Ramey and Joseph McCardle represent a class of some 190 persons who retired from Allied during the period of the 1978 National Bituminous Coal Wage Agreement and received or still receive pensions from the 1974 Pension Plan and Trust. They also received benefits paid for by Allied pursuant to guidelines in the 1974 Benefit Plan and Trust and have been notified that their health benefits will no longer be paid for by Allied. This class also includes the spouses and dependents and surviving spouses and surviving dependents of these retired miners
 
 
 [2]
 District 17, District 29, Local Union 7113 and Local Union 6023 v. Allied Corp., 735 F.2d 121 (4th Cir.1984)
 
 
 [3]
 See UMWA Health and Retirement Funds v. Robinson, 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982)
 
 
 [4]
 Article XX, The National Bituminous Coal Wage Agreement of 1978
 
 
 [5]
 Vera Mining Company became a wholly-owned subsidiary of Royalty Smokeless Coal Company, which is a wholly-owned subsidiary of A.T. Massey Coal Company. Vera later changed its name to Shannon Pocahontas Coal Company
 
 
 [6]
 Prior to acquiring the Harewood mine, Armco signed the 1978 agreement. Vera/Shannon Pocahontas did not sign the 1978 agreement until after it acquired the Shannon Branch mine
 
 
 [7]
 Armco agreed, for example, to provide pension benefits, grant credit for length of service with Allied, continue pension coverage for those Allied workers who had obtained a vested interest in Allied's pension plans and, under certain conditions, to share responsibility with Allied for black lung claims. Shannon agreed, for example, to be responsible to Allied miners who accepted continued employment by Shannon Pocahontas for any claims under the workmen's compensation laws, federal, state and local laws regarding black lung disease, and hospital and medical care plans
 
 
 [8]
 The 1981 contract was adopted on June 7, 1981
 
 
 [9]
 Article III of the 1974 Benefit Trust Agreement provides that "the Trustees shall have full authority ... with respect to administration of coverage and eligibility, methods of providing or arranging for provisions for benefits ... and all other related matters."
 
 
 [10]
 Although it is not necessary to now decide the question of the Trust Fund's responsibility for payment of the retiree benefits in the event circumstances should change so that neither Allied, Armco nor Shannon Pocahontas would be responsible for maintaining the benefits, it seems clear that the Trust Fund in those circumstances would be responsible