**TEAMSTERS LOCAL 391, Affiliated with The International Brotherhood of Teamsters, Plaintiff,**

v.

**BALL CORPORATION, Defendant.**

**No. 1:01CV0404.**

United States District Court, M.D. North Carolina.

Jan. 14, 2005.

Seth R. Cohen, Smith James Rowlett & Cohen, Greensboro, NC, for Plaintiff.

D. Ross Hamilton, Jr., Haynsworth Baldwin Johnson & Greaves, LLC, Greensboro, NC, for Defendant.

## MEMORANDUM OPINION

TILLEY, Chief Judge.

This suit arises from a dispute between Plaintiff Teamsters Local 391 ("Local 391") and Defendant Ball Corporation ("Ball") regarding payments due from a gainsharing agreement at Ball's Reidsville, North Carolina, manufacturing plant. The case is currently before the Court on Ball's Motion for Summary Judgment [Doc. # 18]. For the reasons set forth below, the Defendant's Motion will be GRANTED.

I.

The facts in the light most favorable to the Plaintiff are as follows.

A.

Local 391 has represented the production and maintenance employees at Ball's Reidsville plant since 1979. The Reidsville plant at issue in this case manufactures aluminum cans for Miller Brewing Company and other beverage companies. The Reidsville plant was initially owned and operated by the Miller Brewing Company and thereafter by the Reynolds Metals Company ("Reynolds") until it was acquired by Ball on August 10, 1998.

When Ball acquired the plant, it became the successor to an existing collective bargaining agreement between Reynolds and Local 391 that was effective from October 6, 1997, with an expiration date of October 5, 2000. Ball and Local 391 later negotiated a similar collective bargaining agreement that became effective October 6, 2000, with an expiration date of October 5, 2003.

In 1993, Reynolds owned more than thirty manufacturing facilities throughout the United States when it negotiated the collective bargaining agreement with its Reidsville plant that has formed the nucleus of all subsequent labor agreements at the plant. Although the Reidsville plant was the only facility whose employees were represented by Teamsters, the collective bargaining agreement at each facility contained identical provisions for the operation of a gainsharing plan. The agreements provided that:

a. The maximum payout under the gainsharing plan at each plant would be five percent (5%) of the qualified earnings; and

b. The gainsharing plan would be self-funded, based on the gains realized at

each plant from process improvements, increased productivity and customer satisfaction, improved quality and safety, and lower operating costs. (Joint Aff. ¶ 12.) The agreements further provided that at each plant a committee consisting of an equal number of representatives from the union and management were responsible for developing a gainsharing plan that would operate for that specific facility. The gainsharing plan developed by the committee was required to comply with the terms of the collective bargaining agreement and the guidelines issued by the Gainsharing Corporate Steering Committee contained in the Gainsharing Design Book. Finally, the gainsharing plan had to be approved by the Gainsharing Corporate Steering Committee before becoming effective.

In addition, the collective bargaining agreement between Reidsville and Local 391 provided that the plan must be consistent with the provisions of an attached "Memorandum of Understanding." (Compl. ¶ 7; Answer ¶ 7.) This memorandum stated at the outset that "[a] Plant Gainsharing Plan will be designed to provide gainsharing payments of up to 5% of qualified earnings." (*Id.*) The memorandum then proceeded to list six requirements of the gainsharing plan including that it must be self-funded paying up to one dollar for every two dollars of gain; that the plant gainsharing team must review the plan annually to ensure consistency; and that it must comply with the overtime provisions of the Fair Labor Standards Act. The final item states that the plan is "required to set aside a reserve of 25% of gains, which will be paid at the end of the year after accounting for any quarterly deficits."[1] (*Id.*)

In accord with the collective bargaining agreement, the gainsharing plan for the Reidsville plant was designed by a committee, the Gainsharing Design Team, consisting of five union and five management representatives, who met on twelve occasions. The Gainsharing Design Team was provided with a set of guidelines, the Gainsharing Design Book, which was created by the Gainsharing Corporate Steering Committee so that each of Reynolds' plants would have guidelines for the design and implementation of each plant's gainsharing plan. By the time the Reidsville Design Team was formed, thirty-four of Reynolds' other plants had designed and implemented gainsharing plans in accordance with the guidelines contained in the Gainsharing Design Book.

A section of the Design Book provides explicit instructions to the Design Teams regarding plan requirements and design. Gainsharing plans are required to be self-funded, which is defined to mean that all gains paid to plant employees are "generated from actual monetary savings realized on employee influenced manufacturing costs items at individual locations .... Gains are realized when the actual performance level is better than the baseline established in the approved local gainsharing plan." (Joint Aff. ¶ 21.) The employees' gainsharing pool is funded by up to fifty percent of the gains realized, and the other fifty percent will go directly to the company. (*Id.*) The employees receive fifty percent of their gains so long as that figure does not exceed the cap of 5% of qualified earnings. If fifty percent of their gain does exceed 5% of qualified earnings, the employees would only receive an amount equal to 5% of qualified earnings.

---

1. This final sentence in the Memorandum of Understanding is the source of the ambiguity that Local 391 asserts in this litigation.

The Design Book provides that each plant has the option of making gainsharing payments annually, semi-annually, or quarterly. If the plant chooses to make payments semi-annually or quarterly, it becomes necessary to establish a reserve in order to help protect the company against paying out too much gains when there are losses in later periods. The Gainsharing Design Book clarifies that gains or losses are measured against the whole plan year even when payments are made semi-annually or quarterly, and the reserve is necessary to meet the self-funding requirement. The Gainsharing Design Book sets forth the following rules for calculating the amount of the reserves and the disposition of the reserves, if any, at the end of the plan year:

Plan participants' share of losses go to the reserve.

25% of the plan participants' share of gains to go the reserve unless that leaves the reserve in a negative position. In such cases, additional plan participants' gains will go to the reserve until the reserve is brought back to zero before any gains are shared.

The sum of the gainsharing payments for each gainsharing period cannot exceed 5% of the total qualified earnings for a location's plan. All gains in excess of the 5% of qualified earnings go to the reserve.

Any deficit in the reserve at year end is absorbed by the company.

Any positive reserve balance remaining at year end is shared, up to 5% of qualified earnings.

At year end, any amounts in the reserve in excess of 5% of qualified earnings remain with the company.

(Joint Aff. ¶ 23.) The Gainsharing Design Book also provides five examples demonstrating how the reserve calculations should be performed for plans that adopt quarterly or semi-annual payments and how the reserve funds should be disposed at the end of the year. All of these examples include an "Annual 5% Cap Test," which calculates the amount of the end of year reserve balance that is payable to the employees, if any. Furthermore, one of the five examples specifically illustrates how the reserve funds are distributed at the end of the year when the employees' share of the gains exceeds 5% of their qualified earnings for the year. The example clearly demonstrates that the employees only receive an amount equal to 5% of qualified earnings, and the remainder of the reserve is payable to the company.

The Reidsville Gainsharing Design Team had the Design Book available to them during their meetings and appears to have used the information contained in the book during discussions. The Reidsville Design Team elected to receive quarterly payouts of gains. Accordingly, the Team was required to set aside reserves from any quarterly gains. In the plan document, the Team incorporated verbatim the language from the Design Book discussed *supra* concerning reserve calculations and disposition of the reserve at the end of the plan year. (Joint Aff. ¶ 30.) In addition, the minutes from the Design Team meetings show that there were several discussions relating to the 5% cap. Specifically, the minutes of the February 8, 1995, meeting show that the Team discussed the fact that "Reynolds does have a 5% of all qualified earnings cap to Gainsharing," and that "[t]his cap was part of a negotiated item" by Reynolds. (Joint Aff. ¶ 28.) At the March 29, 1995, meeting the 5% cap on gainsharing payments to the employees was again discussed, and the minutes state that "[t]he most we can get is 5% of the qualified earnings." (*Id.*) Therefore, the minutes of the Design Team meetings show that the 5% cap was discussed during

the creation of the Reidsville gainsharing plan.

The gainsharing plan at the Reidsville plant was submitted to the Corporate Steering Committee at some time before June 30, 1995, which enabled the plan to be retroactively effective from January 1, 1995. The plan has continued in existence since that date under the same terms and conditions under which it was originally implemented. Further, there were no changes to the gainsharing provisions of the collective bargaining agreement when the contract was renegotiated in October 1997 or October 2000.

Since its inception in 1995, the Reidsville gainsharing plan has been consistent in its calculation of the quarterly reserve and payments from the reserve at the end of each year. All year-end payments from the reserve have been limited by the 5% qualified earnings cap. Gainsharing payments from the the end of the year reserve have been limited by the 5% cap in years prior to plan year 2000. For example, in 1998 total gains for the second half of the year were $514,940, but because of the cap, the employees did not receive the entire gainsharing reserve and did not receive one-half of the gains.[2] In 1999, the cap again prevented the full reserve account from being paid to the employees at year end.[3] In both 1998 and 1999, the company paid its employees the full amount allowed under the 5% qualified earnings cap and kept the remainder of the reserve funds for the company.

From October 2 to October 4, 2000, Ball and Local 391 engaged in negotiations for a collective bargaining agreement to replace the labor contract that would expire October 5, 2000.[4] By this time, gainsharing participants had received maximum payouts in the first three quarters of 2000, and it was evident that unless there was a dramatic change in the last quarter, the Reidsville plant would have total gains in 2000 that would significantly exceed the gains in previous years. It was also evident at this time that the reserve account had a significant amount of money in it that could not be paid to the employees because of the 5% qualified earnings cap. The negotiations for a new collective bargaining agreement did not start with a clean slate but were largely based on the currently existing agreement. During the course of these negotiations both Local 391 and Ball submitted written proposals for changes to the collective bargaining agreement and received the other party's responses in writing. In its initial written proposal on October 2, 2000, Local 391 proposed to double the maximum payout from 5% of qualified earnings to 10% of qualified earnings. Ball rejected this proposal. The collective bargaining agreement was entered into by Local 391 and Ball without this change or any other changes to the terms of the gainsharing

2. In 1998, the 5% qualified earnings cap was $250,028.26. The plant had made $123,707.43 in quarterly gainsharing payments, which left a maximum payout at the end of the year of $126,320.83. Therefore, although the reserve held $133,762.57 at the end of the year, the employees were paid only the $126,320.83 that the cap allowed.

3. In 1999, the 5% qualified earnings cap was $639,615.20. The plant had made $502,538.77 in quarterly gainsharing pay-

ments, which left a maximum payout at the end of the year of $137,076.43. The reserve held $395,971.73 at the end of the year, and the employees were paid only the $137,076.43 that the cap allowed.

4. As discussed *supra*, this was the first labor agreement negotiated between Ball and Local 391. Previously, Ball was operating under a collective bargaining agreement negotiated by its predecessor, Reynolds.

plan and became effective for the period of October 6, 2000, through October 5, 2003.

In plan year 2000, the amount of gains realized ($4,945,349) was significantly greater than any previous year, but the calculation of gainsharing payments remained consistent with the methodology and principles that had been used in previous years and that were found in the terms of the collective bargaining agreement and within the gainsharing plan itself. The 5% qualified earnings cap limited gainsharing payments to $649,400.57, an amount which had already been paid out in quarterly payments during the year. At the end of the year a large amount of money remained in the reserve, but because plant employees had already received the maximum payout under the cap, Ball did not pay its employees that money.

### B.

Local 391 filed this lawsuit on April 18, 2001, against Ball claiming breach of their collective bargaining agreement. Local 391, citing to the "Memorandum of Understanding" attached to the collective bargaining agreement, asserts that Ball violated the agreement by "refusing to payout to eligible employees the $618,331.00 remaining in the reserve fund of the Plant Gainsharing Plan." (Complaint ¶ 7.) Local 391 bases this assertion on the Memorandum of Understanding which states:

> A Plant Gainsharing Plan will be designed to provide gainsharing payments of up to 5% of qualified earnings. The plans will be consistent with the provisions of this Memorandum of Understanding. The gainsharing plan will ... (6) *be required to set aside a reserve of 25% of gains, which will be paid at the end of the year after accounting for any quarterly deficits.*

(Complaint ¶ 7; Answer ¶ 7 (emphasis added).) Ball responds that the agreement places a 5% cap on the funds to be paid to employees, that the 5% has been paid, and that Local 391 has no cause of action. Local 391 asserts, however, that the language quoted above requires Ball to pay the full amount of the reserve to employees once any quarterly deficits have been subtracted regardless of the cap.

On July 13, 2001, Ball moved to dismiss the claim arguing that its refusal to pay its employees the money in the reserve account was not a breach of its collective bargaining agreement. In support of its motion to dismiss [Doc. # 4], Ball relied upon its memorandum in support of the motion and the joint affidavit of Arthur Weitz, Mike Martini, Mahia Hicks, and Linda Apple. However, if this Court had considered this joint affidavit in its ruling, the motion to dismiss would have been thereby converted to a motion for summary judgment pursuant to Rule 56. *See Herbert v. Saffell,* 877 F.2d 267, 270 (4th Cir.1989). Therefore, this Court did not consider the joint affidavit in denying Ball's motion to dismiss, noting that "[o]nce evidence is available at a later stage in this proceeding, it may be found that the parties intended to limit the plan to 5%, but such a finding may not be based upon apparently inconsistent provisions of the agreement alleged in the complaint— which is all the Court need consider at the 12(b)(6) stage." (Doc. # 10, p. 3.)

### II.

Summary judgment is proper only when there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e). The material facts are those identified by controlling law as essential elements of claims asserted by the parties. In other words, the materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cox v. County of Prince William,* 249 F.3d 295, 299 (4th Cir.2001). An issue is genuine as to such facts if the evidence is sufficient for a reasonable trier of fact to find in favor of the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In evaluating a motion for summary judgment, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party. *See* Fed.R.Civ.P. 56(e). Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In essence, the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

The Fourth Circuit has explained a court's role when applying the summary judgment rule to contract interpretation:

A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if "susceptible to two reasonable interpretations." The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the

contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact. *World–Wide Rights Ltd. P'ship v. Combe Inc.,* 955 F.2d 242, 245 (4th Cir.1992) (internal citations omitted). The meaning of the collective bargaining agreement in this case must be analyzed under this two-part test.

First, it must be determined if the agreement is ambiguous or unambiguous on its face. This issue was decided on the motion to dismiss where the Court found that the contract language on its face was "apparently inconsistent" and subject to multiple reasonable interpretations.[5] (Doc. # 10, p. 3.) No evidence was submitted with the motion for summary judgment challenging the accuracy of the provisions of the contract considered at the motion to dismiss; thus, the collective bargaining agreement remains ambiguous on its face.

---

5. The ruling on the motion to dismiss only dealt with this first step in the analysis. Because the Court did not consider the affidavit and convert the motion to one for summary judgment, the second step of the analysis was not reached.

However, this does not end the inquiry. This Court must still consider the extrinsic evidence submitted by Ball in support of its motion for summary judgment to determine if it is dispositive of the interpretative issue.[6]

■ When interpreting a collective bargaining agreement, federal courts do not simply use the contract law of the state in which the parties are located, but they must use a body of federal common law. *See McCormick v. AT&T Techs., Inc.*, 934 F.2d 531, 534 (4th Cir.1991) (stating that the LMRA "not only provides federal courts with jurisdiction over employment disputes covered by collective bargaining agreements, but also directs federal courts to fashion a body of federal common law to resolve such disputes). The common law that the federal courts have fashioned does not strictly follow traditional rules of contract interpretation". *United Mine Workers v. Allied Corp.*, 765 F.2d 412, 418 (4th Cir.1985). Instead, federal common law aims to meet the "interpretive necessities of labor agreements born of industrial relationships." *Id.*

■ When interpreting an ambiguous collective bargaining agreement to determine an employer's obligation to provide benefits, the Fourth Circuit looks for the parties' intent as expressed in the language of the agreement itself, but it is also "necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements." *Keffer v. H.K. Porter Co.*, 872 F.2d 60, 62 (4th Cir.1989) (quoting *Transportation-Communication Employees Union v. Union Pacific R.R. Co.*, 385 U.S. 157, 161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966)). The starting point for determining parties' intent is the language of the agreement, but

"[t]he intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion." *Id. See also Burgin v. Office of Personnel Mgmt.*, 120 F.3d 494, 498 (4th Cir.1997) (citing to the *Restatement (Second) of Contracts* § 203(c) for the proposition that "it is generally accepted that we give greater weight to specific and exact language than to more general language").

■ The collective bargaining agreement repeatedly refers to a 5% qualified earnings cap on gainsharing payments. However, the agreement also states in an attached "Memorandum of Understanding" that the company must set aside a reserve which "will be paid at the end of the year after accounting for any quarterly deficits." (Complaint ¶ 7; Answer ¶ 7.) Local 391 asserts that this language shows that the parties intended all of the funds in the reserve account to be paid to Ball's employees at the end of the year regardless of the 5% qualified earnings cap. Looking in isolation at the 5% qualified earnings cap and the statement that reserve funds will be paid at the end of the year, it is unclear whether the cap would apply to the statement that the reserve funds are to be paid at the end of the year. However, in considering the context of the entire agreement, it seems likely that the parties intended for the 5% cap to apply.

The collective bargaining agreement sets up the basic framework that a gainsharing plan, which is to be negotiated separately, must satisfy. The 5% qualified earnings cap on any negotiated plan is clearly set out in the first sentence of the section of the labor agreement concerning gainsharing. The agreement then gives the company an option of creating a gains-

---

**6.** Although Plaintiff is correct in noting that Ball submitted the same memorandum in support of this motion for summary judgment as it did for its motion to dismiss, this Court did not consider Ball's arguments that relied on the attached affidavit at that time.

haring plan that makes payments annually, semi-annually, or quarterly. The reserve fund is a mechanism used by the company to offset any losses in later quarters so that employees will be paid the same under any payment system. If the Reidsville plant's Design Team negotiated a gainsharing plan with annual payments, there would not even be a reserve account. Under Local 391's reading of the collective bargaining agreement, the employees would be able to at least partially avoid the 5% qualified earnings cap by choosing quarterly or semi-annual payments.[7] It seems likely that the parties intended in the last sentence of the labor agreement on gainsharing plan provisions to allow for a reserve fund that would ensure equal payments no matter the payment system chosen by the committee, not one that would create a large disparity. Such a reading appears to harmonize all provisions of the labor agreement as well as give full effect to the first sentence of the gainsharing section of the labor agreement that specifically creates a 5% earnings cap.

Despite Local 391's assertion that the agreement clearly requires all remaining funds in the reserve account be paid to Ball's employees, two additional plausible readings of this same language support Ball's contention that the 5% qualified earnings cap applies to the funds in the reserve account. First, the specific language creating the qualified earnings cap can be read to implicitly modify the sentence that Local 391 asserts requires the entire reserve fund be paid to Ball's employees at the end of the year and there would then be no inconsistency in the agreement. Second, the language Local

391 points to, merely requires that reserve funds must "be paid at the end of the year after accounting for any quarterly deficits." Although Local 391 interprets this statement to require the funds be paid to Ball's employees, the language itself only requires that the reserve account "be paid at the end of the year" and does not state to whom it should be paid. The parties could just as easily have intended for this statement to require only that the reserve fund be zeroed out at the end of the year, meaning that the reserve funds must be paid out of the reserve account to either Ball's employees or back to the company itself. This reading would also be consistent with the language of the entire agreement. Although the language of the entire agreement supports Ball's argument that the parties intended for the qualified earnings cap to apply to the entire agreement, it is not enough alone to grant summary judgment.

In addition to the language of the agreement, the context of the adoption of the collective bargaining agreement and the implementation of the gainsharing plan in the Reidsville plant further support a finding that the parties intended the 5% qualified earnings cap to apply to the reserve account. The collective bargaining agreement negotiated between Ball and Local 391 was largely an adoption of the original agreement negotiated between Reynolds and Local 391. Reynolds modeled the agreement around similar labor agreements it had used with other labor unions at different plants. All of the agreements contained provisions for adopting gainsharing plans that would operate under the same basic guidelines including a 5% quali-

---

7. Looking at the numbers from this case will illustrate the oddity of such a reading. If the Reidsville Gainsharing Design Committee had elected to calculate and make a one-time gainsharing payment at the end of the year, there would have been no reserve fund and Ball would have made a one-time payment of $649,400.57 (5% of the qualified earnings). This is the amount Ball actually paid to the employees in this case. But under Local 391's reading of the labor agreement, simply because the Design Committee chose a quarterly payment system, the employees would receive an additional $618,000.

fied earnings cap. Reynolds' Gainsharing Corporate Steering Committee published a Gainsharing Design Book, which set forth plan requirements including the calculation and use of quarterly reserves. This Design Book was used by the Reidsville plant's Design Team. The Design Book states that "any positive reserve balance remaining at the year end is shared, up to 5% of qualified earnings" and that "any amounts in the reserve in excess of 5% of qualified earnings remain with the company." (Joint Aff. ¶ 23.)

In addition, the 5% qualified earnings cap was specifically discussed by the Reidsville plant Design Team during their drafting meetings. The Reidsville Gainsharing Plan that was adopted by the Design Team quotes the Design Book verbatim regarding the disposition at the end of the plan year that "any amounts in the reserve in excess of 5% of qualified earnings remain with the company." There has been no modification since 1995 of the gainsharing agreement or plan despite subsequent negotiations of a new collective bargaining agreement in 1997 and 2000. Since the implementation of the plan in 1995, reserve worksheets provided in the Design Book have been followed uniformly and have consistently calculated the annual gainsharing payment cap at 5% of qualified earnings.

Ball has consistently applied the 5% qualified earnings cap to all reserve funds at the end of the year. Plan year 2000 is not the first time that a portion of the reserve funds were retained by the company because of the 5% cap. In 1998, the reserve fund had $133,762.57, but the payout to the employees was limited to $126,-320,83 because of the 5% cap. The remainder of the reserve fund was retained by the company. Likewise, in 1999, the reserve fund had $395,971.73, but only $137,076.43 was paid to employees because of the 5% cap. The remainder was again retained by the company. Therefore, when Local 391 and Ball engaged in negotiations in the fall of 2000, it was apparent how the language of the gainsharing plan that was currently in use and had been consistently in use since 1995 was being interpreted and acted upon. At the time of the negotiations, it was also apparent that the company would again benefit from the accumulation of gains in the reserve fund because of the 5% cap on total payments.

Although Local 391 was aware of how the gainsharing plan functioned when the reserve funds exceeded the amount allowed under the 5% cap, they were unsuccessful in negotiating a change to the gainsharing system. The only evidence of any change proposed by Local 391 was to double the maximum payout from 5% to 10% of qualified earnings, but this proposal was rejected by Ball. Local 391 argues that bargaining over the maximum payout of qualified earnings is a different issue than bargaining over whether reserve funds must be paid to employees or kept by the company. However, even if this Court accepted that proposition as true, it does not affect the findings of this Court. Local 391 had to be aware of the interpretation given to the language in previous collective bargaining agreements that allowed the company to retain reserve funds in excess of the 5% cap. The fact remains that Local 391 failed to negotiate a different result although it knew that is how the language had operated in the past and it knew that the company would again be retaining excess funds at the end of plan year 2000. By agreeing to a new contract in October 2000 that did not increase the cap on gainsharing payments, Local 391 once again accepted the longstanding operation of the gainsharing plan that included the 5% qualified earnings cap applying to the reserve account. Local 391 cannot gain through litigation what it failed to negotiate with Ball in October 2000.

After examining the context in which the collective bargaining agreement was entered as well as the practice, usage, and custom of the negotiation of agreements and the operation of agreements at the Reidsville plant and similar plants, no reasonable juror could find that the parties intended anything other than that the 5% qualified earnings cap implicitly applied to the sentence creating a reserve fund in which the funds were to be paid out at the end of the year. There is no question how Ball interpreted the meaning of the collective bargaining agreement. Furthermore, Ball has presented ample evidence to create a finding that Local 391 was aware that the intention of the collective bargaining agreement was to have a 5% cap that applied even to money held in a reserve account. The evidence is undisputed that Local 391 had equal representation on a Gainsharing Design Team that formulated the gainsharing plan for the Reidsville plant; a Gainsharing Design Book was used by the Design Team that detailed how the calculations of the plan would work; the Design Team discussed the impact of the 5% cap at its meetings; at the time Local 391 negotiated the collective bargaining agreement at issue in this case, it had actually experienced in the previous two years the exact same result that it complains of here, a reserve account with funds that were retained by the company because of the 5% cap; and despite all of these facts, Local 391 failed to change the consistent operation of the gainsharing plan when it negotiated a new collective bargaining agreement in the fall of 2000. Therefore, Ball has shown that it is entitled to judgment as a matter of law, and therefore Ball's Motion for Summary Judgment will be GRANTED.

## III.

For the reasons set forth above, Defendant's Motion for Summary Judgment will be GRANTED.

## JUDGMENT

For the reasons set forth in the contemporaneously filed Order, Defendant's Motion for Summary Judgment [Doc. # 18] is GRANTED, and this case is thereby DISMISSED.