In re CF & I FABRICATORS OF UTAH INC., et al., Reorganized Debtors.

CF & I STEEL CORPORATION, Plaintiff,

v.

Joseph P. CONNERS, Sr., Paul R. Dean, William Miller, Donald E. Pierce, Jr., and Thomas H. Saggau as trustees of the United Mine Workers of America 1974 Benefit Plan and Trust; the United Mine Workers of America 1974 Benefit Plan and Trust; and the United Mine Workers of America, Defendants.

Bankruptcy No. 90B–06721.
Adv. No. 92PB–2129.

United States Bankruptcy Court,
D. Utah, Cent. Div.

Jan. 13, 1994.

Frank Cummings and Kenneth L. Cannon II of LeBoeuf, Lamb, Leiby & MacRae, Washington, DC and Salt Lake City, UT, appeared representing Reorganized CF & I Steel Corp.

William F. Hanrahan and Terry Welch of Groom and Nordberg, Chartered, Washington, DC, appeared representing United Mine Workers of America Combined Fund and its Trustees.

Barbara J. Hillman of Cornfield and Feldman, Chicago, IL, appeared representing United Mine Workers of America.

1. The motion for summary judgment on the third cause of action is a partial motion, reserving the issue of insolvency.

2. Future references are to Title 11 of the United States Code unless indicated.

## MEMORANDUM DECISION AND ORDER ON CROSS–MOTIONS DATED 5/7/93 FOR PARTIAL SUMMARY JUDGMENT AND SUMMARY JUDGMENT

JUDITH A. BOULDEN, Bankruptcy Judge.

Two motions for summary judgment are before the court. The first is the Motion Dated 5/7/93 for Partial Summary Judgment filed by Reorganized CF & I Steel Corporation, formerly know as CF & I Steel Corporation, one of the reorganized debtors in this confirmed chapter 11 proceeding (collectively referred to as CF & I). CF & I seeks summary judgment on its first, second, third [1] and fourth causes of action, and on a counterclaim asserted by the United Mine Workers of America (UMWA). The second is the Motion for Summary Judgment of the United Mine Workers of America Combined Fund, an entity into which the named defendant, the United Mine Workers of America 1974 Benefit Plan and Trust (1974 Benefit Plan) has merged, and its Trustees (collectively the Combined Fund). The issues raised require a determination of which entity is obligated to provide medical and life insurance non-pension benefits (Non–Pension Benefits) to certain of CF & I's retired mine workers (Retirees). In addition, CF & I seeks a determination of whether these estates can recover payments previously made by CF & I for such benefits pursuant to 11 U.S.C. § 548, 549 and 550.[2]

The court heard the arguments of counsel, reviewed the affidavits, and has made an independent review of applicable case law and the authorities cited by the parties. Historical facts presented by the multiple affidavits on file are generally not in dispute. The parties dispute the inferences to be drawn from some historical facts, or that certain issues may be ultimate facts or combined issues of fact and law. In these motions plead to the bench and not a jury, the court determines that no disputes exist that would be clarified by further evidence.[3] After care-

3. The parties dispute certain issues regarding whether CF & I sold an "operation", the extent of CF & I's continued liability to provide Non-Pension Benefits, whether CF & I was obligated to ensure that Wyoming Fuel continue to provide

ful review, the court finds that there are no genuine issues as to any material facts and that the legal issues raised are ripe for summary judgment. *Gonzales v. Millers Casualty Ins. Co. of Texas,* 923 F.2d 1417, 1418 (10th Cir.1991). The court has viewed the facts presented in the light most favorable to each party opposing summary judgment. Based thereon, the court makes the following ruling.

## I. *JURISDICTION*

██ CF & I plead that the issues presented in its complaint are core matters as set forth in 28 U.S.C. § 157(b)(2)(A), (H) and (O). The UMWA denied the assertion and counterclaimed, but did not comply with Bankruptcy Rule 7008. The Combined Fund asserted that whether the issues are core is a legal issue. No party has argued in these cross-motions for summary judgment that this court cannot enter a final order. The court has independently reviewed, pursuant to 28 U.S.C. § 157(b)(3), whether this is a core proceeding and has determined that the issues raised fall within the subsections set forth in CF & I's complaint. Therefore, pursuant to 28 U.S.C. §§ 157(b) and 1334, and District Court Rules of Bankruptcy Practice and Procedure, D. Utah 404(a) that automatically refers bankruptcy cases and proceedings to this court for hearing and determination, this court can enter a final order.

## II. *ISSUES PRESENTED FOR SUMMARY JUDGMENT*

CF & I seeks summary judgment on its first, second and fourth causes of action,[4] and partial summary judgment on its third cause of action. CF & I's first cause of action requests judgment declaring that CF & I is not liable to provide Non–Pension Benefits to Retirees after the date of the filing of the complaint. Instead, CF & I asserts that the Combined Fund[5] is obligated to make such payments. CF & I's second cause of action

is for judgment declaring that CF & I has not been liable to provide Non–Pension Benefits to Retirees since at least December 1, 1984, and that instead the Combined Fund is so obligated. The third cause of action upon which CF & I seeks partial summary judgment on all issues except insolvency, seeks recovery from the Combined Fund pursuant to § 548 and § 550 of all amounts paid by CF & I for Retirees' Non–Pension Benefits for the one year period before November 7, 1990, the date of the filing of this case. The fourth cause of action seeks relief pursuant to § 549 and § 550 to recover the value of all amounts paid or to be paid by CF & I for Retirees' Non–Pension Benefits after November 7, 1990, from the Combined Fund.

The UMWA's counterclaim seeks judgment declaring that CF & I has a continuing obligation to provide Non–Pension Benefits to Retirees. The UMWA further requests this Court to enjoin CF & I from discontinuing the payment of Non–Pension Benefits. It also seeks an order requiring CF & I to continue to provide such benefits to its former employees and their dependents.

The Combined Fund's motion for summary judgment seeks an order declaring that the 1974 Benefit Plan is not liable for Non–Pension Benefits to Retirees and that CF & I remains liable. It further requests a judgment denying that the 1974 Benefit Plan is liable to CF & I for any amount expended to provide Non–Pension Benefits to Retirees.

## III. *UNCONTESTED FACTS*

### A. *THE PARTIES*

CF & I Steel Corporation, and its nine related entities were engaged in the manufacture of steel products, and various support ventures, including operation of two coal mines. The UMWA represented certain individuals employed by CF & I. The National Bituminous Coal Wage Agreement of 1974

---

health benefits, and whether the Combined Fund succceds to the liabilities of the 1974 Benefit Trust. CF & I also disputes the implications of certain facts the Combined Funds asserts are undisputed.

4. CF & I designated its claim for relief as causes of action. *See* Bankruptcy Rule 7008(a).

5. The complaint prayed for relief against the 1974 Benefit Plan. The parties now argue the relative liabilities of the Combined Fund.

between the UMWA and coal mine operators, including CF & I, established the 1974 Benefit Plan. The 1974 Benefit Plan was a non-pension benefit trust fund that provided Non–Pension Benefits to union Retirees who retired on or after January 1, 1976, and prior to February 1, 1993.[6] The 1974 Benefit Plan was continued pursuant to the National Bituminous Coal Wage Agreements of 1978, 1981, 1984 and 1988.

The Coal Industry Retiree Health Benefit Act of 1992 (CIRHBA), 26 U.S.C. §§ 9701–9721, enacted in October of 1992 and effective February 1, 1993,[7] provided that the 1974 Benefit Plan and the United Mine Workers of America 1950 Benefit Plan merged into the Combined Fund, and that the Combined Fund is the successor to the 1974 Benefit Plan.[8] The Combined Fund is a multi-employer welfare benefit plan within the meaning of 29 U.S.C. §§ 1002(1), (37), described in 29 U.S.C. § 186(c)(5). It is to provide enrollment to individuals who, on July 20, 1992, were eligible to receive and receiving benefits from the 1950 Benefit Plan or the 1974 Benefit Plan, or the beneficiaries of such individuals. CIRHBA, § 9703(e).

## B. CF & I AND CLOSURE OF THE MINES

Before 1982, CF & I owned and operated two coal mines, the Maxwell or Golden Eagle Mine and the Allen or New Elk Mine (Mines), as producing coal mines. Prior to 1982, CF & I reached collective bargaining agreements with the UMWA covering union workers in the Mines. The last collective bargaining agreement between CF & I and the UMWA was The Labor Agreement of 1981 Between CF & I Steel Corporation and the International Union, United Mine Workers of America, Local Union 9856 Covering the Allen and Maxwell Mines, (1981 UMWA Agreement). The 1981 UMWA Agreement provided that CF & I would maintain a benefit plan to provide health and other Non–Pension Benefits to its employees.[9]

---

**6.** The 1974 Benefit Plan was a multi-employer welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. sections 1001–1461. The National Bituminous Coal Wage Agreement of 1946 created a welfare and retirement fund as well as a medical and hospital fund for coal miners. In 1974, the fund was continued in the form of four separate trusts—the 1950 Pension Trust and the 1950 Benefit Trust that provided benefits to previous retirees. The remainder was the 1974 Pension Trust and the 1974 Benefit Trust that provided benefits for subsequent retirees. Financial difficulties resulted in the primary responsibility for employee benefits to separate plans to be established by individual signatory employers; but the 1974 Benefit Plan was retained as a "safety net" for "orphaned" miners. *Grubbs v. United Mine Workers of America,* 723 F.Supp. 123, 124 (W.D.Ark.1989). *District 17, UMWA v. Allied Corp. (Allied II),* 765 F.2d 412, 414 (4th Cir.), *cert. denied,* 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985) and *UMWA v. Nobel,* 720 F.Supp. 1169 (W.D.Pa. 1989), *aff'd,* 902 F.2d 1558 (3d Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991), trace the history of the 1974 Benefit Trust, especially in relation to various rulings by courts interpreting its provisions.

**7.** The complaint naming the United Mine Workers of America 1974 Benefit Plan and Trust as a defendant was filed on March 30, 1992. It has never been amended to name the Combined Fund.

**8.** CIRHBA sets forth that the Combined Fund provides benefits to some but not all of the former beneficiaries of the 1974 Benefit Plan. The United Mine Workers of America 1992 Benefit Plan (1992 Benefit Plan) provides benefits to other former 1974 Benefit Plan beneficiaries. If, but for the enactment of CIRHBA, an eligible beneficiary would be eligible to receive benefits from the 1974 Benefit Plan, or if coverage is required to be provided but the eligible beneficiary does not receive such coverage, the 1992 Benefit Plan is to provide the coverage. CIRHBA, section 9712(b)(2). As of February 1, 1993, the contractual obligations of the 1974 and 1950 Benefit Plans were replaced by statutory obligations under CIRHBA. Since all events discussed herein arose prior to February 1, 1993, this ruling is not intended as an interpretation of CIRHBA.

**9.** Article 20—Health and Retirement Benefits of the 1981 UMWA Agreement provided at Section (c) 1971 Plans and Trusts (3) as follows:

(i) **CF & I** shall establish **and maintain** an Employee benefit plan to provide health and other non-pension benefits for its Employees covered by this Agreement as well as pensioners, under the 1974 Pension Plan and Trust, whose last classified employment was with **CF & I** . . . . The benefits provided by **CF & I to its eligible Participants** pursuant to such plans shall be guaranteed during the term of this Agreement by **CF & I** at levels set forth in such plans . . . .

(ii) The 1974 Benefit Plan and Trust provides health and other non-pension benefits, during the

The 1981 UMWA Agreement provided that the 1974 Benefit Trust was incorporated by reference in the 1981 UMWA Agreement. As a result, the 1974 Benefit Trust or any successor was obligated to provide Non–Pension Benefits to any retired miner who would otherwise cease to receive Non–Pension Benefits because the signatory employer (including successors and assigns) for whom the miner last worked was no longer in business.

The 1981 UMWA Agreement also provided that the termination date of the 1981 UMWA Agreement was on or about November 30, 1984.[10] No party to the 1981 UMWA Agreement has provided written notice of the termination of the 1981 UMWA Agreement to any other party.

CF & I closed the Maxwell Mine on October 2, 1981, and laid off all work force except eight maintenance employees. CF & I closed the Allen Mine on June 26, 1982, and laid off all work force except twenty-three maintenance employees. Production from the mines ceased as part of substantial restructuring of operations intended to reduce costs and improve CF & I's financial position. Closure was not motivated by a desire to avoid successorship obligations under the 1981 UMWA Agreement. The layoffs were temporary and the mines were on "idle standby" status. CF & I did not resume operations from the Mines. Neither did it receive any material income from the production, sale, or transportation of coal or related activities after the shutdown.[11]

## C. CF & I'S SALE OF THE MINES TO WYOMING FUEL

In January of 1983, CF & I began to market the Mines for sale. On November 16, 1983, CF & I sold its interest in the Mines to Wyoming Fuel, Inc. (Wyoming Fuel) by an Agreement for Purchase and Sale of Assets dated November 16, 1983 (Sale Agreement). The Sale Agreement provided that Wyoming Fuel would assume and perform certain of CF & I's obligations.[12]

term of this Agreement, to any retired miner under the 1974 Pension Plan or any successor plan(s) thereto who would otherwise cease to receive the health and other non-pension benefits provided herein because the signatory employer (including successors and assigns) **for whom such miner last worked in signatory classified employment** is no longer in business.... **For purposes of determining eligibility under the 1974 Benefit Plan and Trust, CF & I is considered to be "no longer in business" only if CF & I:**
(a) **has ceased all mining operations and has ceased employing persons under this Labor agreement, with no reasonable expectation that such operations will start up again; and**
(b) **is financially unable (through either the business entity that has ceased operations as described in subparagraph (a) above, including such company's successors or assigns, if any, or any other related division, subsidiary, or parent corporation, regardless of whether covered by this Labor Agreement or not) to provide health and other non-pension benefits to its retired miners and surviving spouses.** (emphasis in original)

10. Article 29 of the 1981 UMWA Agreement provided:
Except as provided in Article 18, section (b) (Severability Clause), this Agreement shall not be subject to termination by either party signatory hereto prior to **11:59 p.m., October 31, 1984,** provided, however, that either the parties of the first part or the party of the second part may terminate this Agreement on or after **11:59 p.m.,** **October 31, 1984** by giving at least sixty days written notice to the other party of such desired termination date. (emphasis in original)

11. 1974 Benefit Trust Q & A H–16 provided:
Question: When is a company "no longer in business" for purposes of health and death benefit obligations of the 1974 Benefit Trust?
Answer: A company is "no longer in business" when
 1. the company claims that it is no longer in business by notifying the Funds in writing that the company is no longer in business and will not resume operations and thus requests that the Funds, in reliance upon the company's statement, make payments to any appropriate beneficiaries eligible under provisions of the amended 1974 Benefit Plan and Trust; and
 2. the company has not received income from the production or sale of coal, or transportation of coal, or related activities, for at least six months even if it retains a license to engage in coal mining or processing within the applicable state or states and retains an office.
A company may still be in business even if it satisfied # 2 if circumstances clearly indicate that the company remains in business. For example, a company is still in business even if it has not mined coal for six months if the company is publicly seeking new employees or if the company indicates to its laid-off employees that it will re-employ them at an early future date.

12. The Sale Agreement provided at 2.2.1 that Wyoming Fuel would assume and perform as follows:

Under the Sale Agreement, CF & I agreed to provide Non–Pension Benefits to Retirees to the extent, and for the period, they were required by the 1981 UMWA Agreement.[13]

CF & I employees represented by the UMWA continued to work at the Mines through December of 1983. They maintained electrical, mechanical, roof support and ventilation systems; pumped water in the Mines and cleaned up roof falls; and inspected the Mines for hazardous conditions.

At the time of the sale of the Mines, they were on idle standby status. The Mines had not been abandoned or sealed, there had been no announcement that the Mines would not be reopened, and the employees were on temporary lay off. The sale occurred sixteen months after CF & I ceased coal mining operations. There was no "operational linkage" between CF & I and Wyoming Fuel.

Wyoming Fuel began operating the Mines in January of 1984 at the same locations and with the same types of operations as CF & I. Wyoming Fuel hired CF & I's prior employees, and all of the classified employees hired by Wyoming Fuel to work at the Maxwell Mine were former classified employees of CF & I. Wyoming Fuel continues to operate the Maxwell Mine to the present date and is a signatory to the 1988 Wage Agreement.

Following its sale of the Mines, CF & I did not employ members of the UMWA under any collective bargaining agreement with the UMWA. There are approximately 224 Retirees and dependents of CF & I's Retirees who were covered under the 1981 UMWA Agreement. All workers who had been in the employ of CF & I at the time they retired from the coal industry retired before 1984.

## D. WYOMING FUEL'S AGREEMENTS WITH THE UMWA

Wyoming Fuel negotiated a Memorandum of Understanding with the UMWA dated November 9, 1983, (1983 Memorandum of Understanding) under which Wyoming Fuel assumed certain of CF & I's obligations under the 1981 UMWA Agreement.[14] The 1983 Memorandum of Understanding also modified certain material provisions including wages and the termination date of the 1981 UMWA Agreement. The bargaining unit covered by the 1981 UMWA Agreement between CF & I and the UMWA was the same bargaining unit covered by the 1983 Memorandum of Understanding. The 1983 Memorandum of Understanding executed by Wyoming Fuel and the UMWA, allowed CF & I and Wyoming Fuel to allocate between themselves the obligation to provide Non–Pension Benefits under the 1974 Benefit Plan.[15] This understanding agreed to by the UMWA was not in accord with the provisions of the 1981 UMWA Agreement.[16] Wyoming Fuel ex-

---

The contracts [including] ... the 4/1/81 Labor Agreement with the International Union United Mine Workers of America.... (which is to be assumed insofar as it relates to persons Buyer employs to work at the Mining Premises after the Closing Date, but is not to be assumed by Buyer insofar as it relates to any other person formerly employed by Seller at the Mining Premises or elsewhere) which are usual and customary to its business.

**13.** The Sale Agreement provided at 2.4.2:

Except for former employees of Seller who are hired by Buyer, Seller agrees to pay all employee benefits to employees on layoff or retirement, either prior to or as a result of the Closing, to the extent and for the period they are required by the provisions of the Union Contract.

**14.** The 1983 Memorandum of Understanding provided:

2. Those [M]ines are presently covered by a Collective Bargaining Agreement between the Union and CF & I Steel Corporation, which Agreement is signed and dated March 27, 1981.
3. The Company [Wyoming Fuel] agrees to assume CF & I's rights and obligations under that Agreement, expect as expressly modified in this Memorandum.

**15.** Paragraph 9 of the 1983 Memorandum of Understanding provided:

CF & I and the Company shall allocate between themselves the obligation to provide health and other non-pension benefits for employees and pensioners under the 1974 Pension Plan and Trust which obligation is contained in Article 20(c)(3)(i) of the 1981 Agreement.

**16.** Article 1—Enabling Clause Section (b) **Sale or Transfer of Coal Operations**, provided:

This Agreement shall be binding upon the **parties signatory** hereto, and their successors. In consideration of the Union's execution of this Agreement, **CF & I** promises that its operations **described in Article 2 Section (f)** as covered by this Agreement shall not be sold, conveyed, or

pressly did not assume CF & I's obligations under the 1981 UMWA Agreement to pay non-pension benefits. Paragraph six of the 1983 Memorandum of Understanding extended the termination date of the 1981 UMWA Agreement to December 31, 1985.

Wyoming Fuel and the UMWA reached collective bargaining agreements since the expiration of the 1983 Memorandum of Understanding, including a 1987 Memorandum of Understanding that provided that the parties would be bound by the terms of the National Bituminous Coal Wage Agreement of 1984 for the remainder of its term. Wyoming Fuel was also a signatory to the National Bituminous Coal Wage Agreement of 1988.

### E. CF & I'S CONTINUED PAYMENTS UNDER THE 1981 UMWA AGREEMENT

By letter dated October 21, 1983, the UMWA assessed CF & I with substantial withdrawal liability under the United Mine Workers of America 1950 Pension Plan, because of CF & I's permanent cessation of all covered operations. The October 21, 1983, letter indicated that CF & I withdrew from the pension plan on or about June 1982, (the date of the closure of the Allen Mine). CF & I subsequently paid several million dollars in withdrawal liability.[17]

As required by the Sale Agreement, CF & I provided Non–Pension Benefits through the term of the 1981 UMWA Agreement, even as extended by the 1983 Memorandum of Understanding, to which CF & I was not a party. Since the expiration of the 1981 UMWA Agreement as extended to December 31, 1985, CF & I has continued to provide Non–Pension Benefits to Retirees on the assumption, now disputed, that the Sale Agreement so required.

CF & I has provided Non–Pension Benefits to Retirees from the beginning of 1985 through the end of October 1992. The amounts include $1,974,987 in health claims, and $45,500 in death benefits, for a total of $2,020,487 in Non–Pension Benefits. An itemization of the specific amounts paid by CF & I within one year before its Chapter 11 filing and thereafter is not before the court, but the undisputed evidence shows CF & I paid some amounts approximating $300,000 in the year before filing, and $500,000 post petition.

### F. CF & I'S CHAPTER 11 AND PLAN OF REORGANIZATION

CF & I filed a petition under Chapter 11 on November 7, 1990. By letter dated January 29, 1992, CF & I advised the trustees of the 1974 Benefit Plan that CF & I did not believe that it continued to be obligated to provide Non–Pension Benefits to UMWA Retirees. The trustees responded that the 1974 Benefit Plan was prohibited by the terms of the governing plan document from assuming responsibility for the benefits. CF & I's payments subsequent to January 29, 1992, were made by CF & I even though it deemed the 1974 Benefit Plan was liable for the payments. On March 30, 1992, CF & I filed this complaint.

On February 12, 1993, the court executed an order confirming CF & I's reorganization plan (Plan of Reorganization) to become effective March 3, 1993. The Plan of Reorganization defines "retiree benefits" as "insurance or medical benefits payable after retirement to a former employee of the Debtors who retired or an employee of the Debtors who is eligible to retire on or before the Effective Date and who retires within three years after the Effective Date and is otherwise entitled to such benefits."

otherwise transferred or assigned to any **purchaser, executer, administrator or trustee** without first securing the agreement of the **purchaser, executer, administrator or trustee** to assume **CF & I's** obligations under this Agreement. Provided that **CF & I** shall not be a guarantor or be held liable for any breach by the **purchaser, executer, administrator or trustee** of its obligations, and the UMWA will look exclusively to

the **purchaser, executer, administrator or trustee** for compliance with the terms of this Agreement. (emphasis in original)

17. Under ERISA, section 4203(a), "a complete withdrawal from a multiemployer plan occurs when an employer ... (2) permanently ceases all covered operations under the plan." Withdrawal triggers withdrawal liability to the plan.

The confirmed Plan of Reorganization establishes a Voluntary Employees' Beneficiary Association (VEBA). The VEBA is funded with up to $67.5 million in payments with 9.5% annual interest over ten years made by the purchaser of assets under the Plan of Reorganization. The VEBA is also funded with a cash payment by CF & I, made on the Effective Date, of $872,000. The Plan of Reorganization provides that the Reorganized Debtor will have no further liability to Retirees for Non–Pension Benefits other than the cash payment of $872,000.

UMWA recipients of the Non–Pension Benefits at issue received the Plan of Reorganization and voted, along with other members of Class 1, to accept the Plan of Reorganization. CF & I made the required payment.

## IV. DISCUSSION

### A. CF & I IS NO LONGER LIABLE UNDER THE 1981 UMWA AGREEMENT

To resolve whether CF & I or the Combined Fund is liable for Non–Pension Benefits, it is necessary to review when each parties' liabilities arose or terminated. It is also necessary to determine if the nature of the parties' respective liabilities changed from contractual to statutory, or to liabilities arising under federal common law.

#### Wyoming Fuel's Obligations

■ In Article 1, Section (b) of the 1981 UMWA Agreement between CF & I and the UMWA, CF & I promised that it would not sell its operations to any purchaser without first securing the agreement of the purchaser to assume CF & I's obligations under the 1981 UMWA Agreement. In spite of that contractual promise, CF & I did not require Wyoming Fuel to assume liability for CF & I's Retirees. Contrary to the express terms of the 1981 UMWA Agreement, a provision for the allocation of liabilities between CF & I and Wyoming Fuel was contained in the 1983 Memorandum of Understanding executed by Wyoming Fuel and the UMWA. There is no document executed by both CF & I and the UMWA that relieves CF & I of its obligations under Article 1, Section (b).

However, it is apparent that the UMWA knew of the terms of the Sale Agreement (that postdated the 1983 Memorandum of Understanding), and that the allocation of liabilities allowed by the 1983 Memorandum of Understanding would not require Wyoming Fuel to assume CF & I's liabilities for Non–Pension Benefits.

Whether CF & I and the UMWA intended to modify the provisions of the 1981 UMWA Agreement, or whether both parties agreed that the transfer to Wyoming Fuel was not the transfer of an "operation," is not contained in the record presently before the court. Their intent, however, is not unimportant because the effect on Wyoming Fuel is the same. Nothing in the Sale Agreement between CF & I and Wyoming Fuel suggests that Wyoming Fuel either expressly or by implication assumed the liability for the Non–Pension Benefits; to the contrary, allocation of the obligations indicated it did not. Wyoming Fuel has no contractual obligation to provide Non–Pension Benefits to Retirees.

#### Failure to Terminate According to the Provision of the 1981 UMWA Agreement

■ The Combined Fund and the UMWA assert the 1981 UMWA Agreement remains in effect upon the filing of this bankruptcy, upon confirmation and is still in effect, and CF & I is contractually obligated thereunder because no party followed its termination provisions by giving sixty days written notice of the desired termination. Certainly the contract provides for written notice of termination and generally the contract would continue until the parties gave such notice. *National Labor Relations Board v. Lion Oil Co.*, 352 U.S. 282, 292, 77 S.Ct. 330, 336, 1 L.Ed.2d 331 (1957) (contract provision prohibiting termination or modification of collective bargaining agreement unless written notice is served prohibits party desiring modification or termination from resorting to strike or lockout for 60 days after notice or until expiration date of contract, whichever occurs later); *New York News Inc. v. Newspaper Guild of New York*, 927 F.2d 82, 84 (2nd Cir.1991) (each party to a collective bargaining agreement had an unqualified right to

terminate the agreement after its expiration by providing written notice, and the agreement was terminated after written notice of termination was given).

The 1983 Memorandum of Understanding between the UMWA and Wyoming Fuel, and to which CF & I was not a party, extended the termination date of the 1981 Agreement to 11:59 p.m., December 31, 1985. Apparently the UMWA and Wyoming Fuel deemed themselves empowered to modify and extend the terms of the 1981 UMWA Agreement without CF & I being a party to the 1983 Memorandum of Understanding. Such action is support for CF & I's position that the 1983 Memorandum of Understanding superseded and terminated CF & I's obligations under the 1981 UMWA Agreement.

The UMWA's action to modify and extend the termination provisions of the 1981 UMWA Agreement is indicative that it is not unusual that a contract also end without following the formalities of a contractually prescribed written termination notice if the parties alter the contract by mutual agreement. *West India Industries, Inc. v. Tradex (In re Tradex Petroleum Services)*, 664 F.2d 946, 949–950 (5th Cir.1981) (a binding contract is but a meeting of the minds that can be rescinded or altered by mutual agreement). Even labor agreements can be modified if no intervening third party rights have vested. *Conners v. Link Coal Co.*, 970 F.2d 902 (D.C.Cir.1992) (describing the ability to modify vested rights in the 1950 Pension Plan); *See also Lucas v. Bechtel Corp.*, 800 F.2d 839, 848 (9th Cir.1986) (parent union labor agreement expressly reserved the right to modify the contract at any time by mutual consent, even if local union was intended third party beneficiary). Even if there is no mutual agreement, other circumstances may cause the termination of a labor contract without following contractual provisions for termination. *Carpenters Amended & Restated Health Benefit Fund v. Holleman Construction Co.*, 751 F.2d 763, 767–770 (5th Cir.1985) (because an ambiguous short-form labor agreement was parasitic upon the existence of a master agreement, it perished with its host although no notice of termination was given).

The Tenth Circuit has also considered whether it is possible to terminate a labor agreement if formal notice of termination required by the agreement has not been given. The Court concluded that it is possible to terminate if the employer's intent to terminate the agreement is adequately manifest by its noncompliance. *International Brotherhood of Electrical Workers, Local No. 12 v. A–1 Electric Service, Inc.*, 535 F.2d 1, 4 (10th Cir.), *cert. denied*, 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976) (in spite of the employer's noncompliance with the termination provision by failing to give written notice of termination, the contract was terminated since the employer's intent to terminate the agreement was adequately manifest by its noncompliance). CF & I's noncompliance with the obligation to require Wyoming Fuel to assume liability for the Non–Pension Benefits was known to all by the Sale Agreement and the 1983 Memorandum of Understanding that predated the Sale Agreement. CF & I's intent to terminate the 1981 UMWA Agreement was also adequately manifest by its sale of the Mines, and by the transfer of its liability to Wyoming Fuel of all obligations under the 1981 agreement except the Non–Pension Benefits.

The issue remaining is whether CF & I, the UMWA or Wyoming Fuel could somehow bifurcate the liabilities arising under the 1981 UMWA Agreement between CF & I and Wyoming Fuel so that the contract was no longer a unified document. If so it would be one in which CF & I maintained certain contractual obligations to the UMWA and Wyoming Fuel assumed others. Besides the difficulty with such a bifurcation as a legal concept, it is inconsistent with traditional labor law. Instead, the more reasoned interpretation of the events is that the 1983 Memorandum of Understanding superseded or vacated the 1981 UMWA Agreement prior to the actual sale to Wyoming Fuel a week later.

First, CF & I no longer employed any United Mine Workers and could not fulfill its obligations to settle all employee grievances and complaints according to the grievance procedure, or to continue to bargain regarding United Mine Workers. Once Wyoming

Fuel purchased the Mines pursuant to the Sale Agreement, Wyoming Fuel became the only employer of United Mine Workers at the Mines. CF & I did not employ United Mine Workers after that and, pursuant to NLRA § 8(A), 29 U.S.C. § 158(a) could not contract with a union when it did not employ a substantial and representative complement of the work force in the bargaining unit, or at the time when CF & I was not engaged in normal operations within that unit. *Sheraton Great Falls Inn,* 242 N.L.R.B. 1255, 1979 WL 9206 (1979) (an employer that executes a collective bargaining agreement with a union at a time when it does not employ a substantial and representative compliment of the projected work force in the relevant bargaining unit, and at a time it is not engaged in normal operations, violates the Act).

■ Second, the 1983 Memorandum of Understanding that substituted Wyoming Fuel for CF & I and provided for Wyoming Fuel's assumption of CF & I's obligations under the 1981 UMWA Agreement, became the only collective bargaining agreement governing an employer's obligations to the bargaining unit of the UMWA with respect to the Mines. A bargaining unit cannot be covered by more than one employer's collective bargaining agreement at a time. *Cf. U.A. 198 Health & Welfare, Education & Pension Funds v. Rester Refrigeration Services Inc.,* 790 F.2d 423, 425 (5th Cir.1986), *cert. denied,* 485 U.S. 904, 108 S.Ct. 1074, 99 L.Ed.2d 233 (1988) (employer must honor the terms and conditions of an expired collective bargaining agreement until a new agreement is reached or until contract negotiations offer no hope of agreeing); *Baker v. Newspaper & Graphic Communications Union, Local 6,* 628 F.2d 156, 159–60 (D.C.Cir.1980) (subsequent collective bargaining agreement supersedes prior labor agreement, and unvested rights arising under prior contract are lost).

■ Third, collective bargaining agreements between Wyoming Fuel and the UMWA, including the 1983 Memorandum of Understanding, the Memorandum of Understanding dated November 10, 1987, and the National Bituminous Coal Wage Agreement

of 1988, show that Wyoming Fuel and not CF & I was the employer of mine workers at the Mines. The bargaining unit that was once covered by the 1981 UMWA Agreement, was subsequently covered by new wage agreements: therefore, the 1981 UMWA Agreement expired when the new wage agreement became effective. *Baker,* 628 F.2d at 159–60. CF & I's contractual obligations under the 1981 UMWA Agreement ceased when the UMWA bargaining unit covering the Mines and Wyoming Fuel agreed, in the 1983 Memorandum of Understanding, that Wyoming Fuel would assume CF & I's obligations under the 1981 UMWA Agreement. Therefore, the old CF & I agreement was subsumed into the new one. Indeed, Article 29, as modified by Wyoming Fuel and the UMWA, must have referred to Wyoming Fuel as the signatory party able to give notice of termination, not CF & I, because CF & I was not a party to the modification. CF & I had no continuing contractual obligations under the 1981 UMWA Agreement to provide Non–Pension Benefits to Retirees. The only contractual obligation that remained after execution of the 1983 Memorandum of Understanding was that assumed by CF & I under the Sale Agreement to provide Non–Pension Benefits to Retirees to the extent and for the period they were required by the provisions of the 1981 UMWA Agreement.

*CF & I Breached the 1981 UMWA Agreement Because it Sold an Operation to Wyoming Fuel*

■ If CF & I transferred an "operation" covered under the 1981 UMWA Agreement, it was required to arrange for Wyoming Fuel to assume the obligations under the 1981 UMWA Agreement. CF & I argues that under the question and answer format adopted by the Trustee of the 1974 Benefit Plan, CF & I was not obligated to ensure that Wyoming Fuel provide Non–Pension Benefits to Retirees because the Mines ceased actively producing coal for six months before CF & I sold them to Wyoming Fuel; therefore, the Mines were not "operations" subject to the successor requirement of Article I of the 1981 UMWA Agreement.[18]

18. As reiterated in *District 17, UMWA v. Allied* *Corp. (Allied II),* 765 F.2d 412, 416 (4th Cir.),

For the purposes of summary judgment, determination of what constitutes an operation for successor liability is a question of law to which the uncontested facts can be applied. Applicable case law is helpful in determining circumstances in which the sale of an operation did not occur. *UMWA v. U.S. Steel Mining, Inc.*, 895 F.2d 698, 701–02 (10th Cir.1990) (The purchaser neither reopened nor produced, but did conduct limited maintenance, security and salvage activities after operations at a mine ceased. Most of its employees were laid off, and the mine maintained in "idle standby" status until it was finally declared abandoned and indefinitely closed.); *UMWA v. LTV Steel Corp. (In re Chateaugay Corp.)*, 891 F.2d 1034 (2nd Cir.1989) (the mine had been permanently closed by the seller and there was no evidence that the same operations could be contemplated or conducted in a mine site that had been sealed, its buildings razed, and reclaimed); *In re Kaiser Steel Corp.*, 106 B.R. 669, (Bankr.D.Colo.1989) (the debtor/seller sold a mine that was not operating, and that it never operated before sale); *UMWA v. No. American Coal Corp.*, slip opinion no. C–279–242 (S.D.Ohio 1980) (the mine was sold over a year after operations ceased and eleven months after it was announced that the mine would not be reopened).[19]

In this case CF & I's Mines had been in production for years. CF & I ceased production and the Mines were on idle standby status. The employees were on temporary lay off. The Mines had not been abandoned or sealed. There is no evidence that there had been any announcement that the mines would not be reopened. Wyoming Fuel recommenced production from the Mines immediately after the purchase. Under these facts, the Mines had not ceased to function as active coal mines and the sale by CF & I of the Mines to Wyoming Fuel was the sale of an "operation." Therefore, Wyoming Fuel was a successor, and CF & I was obligated to require Wyoming Fuel to assume the obligation to pay Non–Pension Benefits or CF & I was in breach of the 1981 UMWA Agreement.

### The Appropriate Time Period to Measure Damages for the Breach

Since CF & I breached the 1981 UMWA Agreement, CF & I had two obligations to pay Non–Pension Benefits to Retirees: a contractual obligation in favor of Wyoming Fuel pursuant to the Sale Agreement, and the payment of damages founded on an equitable remedy for breach of the 1981 UMWA Agreement. The second obligation was not based on a continuing contractual liability for payment. The parties concur that if CF & I was in breach, the proper measure of damages would have been payment of Non–Pension Benefits to Retirees as actually occurred. The dispute arises in deciding the period for which CF & I would have been liable to make the payments.

A similar though not identical factual situation was presented in *District 17, UMWA v. Allied Corp. (Allied II)*, 765 F.2d 412 (4th Cir.), *cert. denied*, 473 U.S. 905, 105 S.Ct.

---

cert. denied, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985), the Trustees of the 1974 Benefit Plan have generally defined "successor" as a purchaser who (1) signs a collective bargaining agreement, (2) draws a majority of its employees from the seller, (3) operates at the same geographical location performing essentially the same job functions, (4) has not suspended its operations for more than six months, and (5) either acquires a substantial portion of the seller's assets or is owned and operated by the same persons controlling the seller. *See also Fall River Dyeing & Finishing Corp. v. National Labor Relations Board*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). The parties do not dispute that all those conditions are fulfilled save whether there was a transfer of an operation.

**19.** In *District 17, United Mine Workers of America v. Allied Corp. (Allied I)*, 735 F.2d 121, 133 (4th Cir.1984), *rev'd on reh'g en banc*, 765 F.2d 412, *cert. denied*, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985), the court indicated that the purchasers did not qualify as "successors" because there was no evidence that the purchasers hired a majority of Allied's employees or that the purchasers were owned and operated by the same people who owned and operated Allied. Nonetheless, in *Allied II*, the Fourth Circuit focused on the breach of contract issue, finding that the Trustees did not act arbitrarily and capriciously in determining the purchasers were "successors", without any explanation of why its reading of the District Court's ruling and the facts contained therein reached a different conclusion than *Allied I*.

3527, 87 L.Ed.2d 652 (1985). In violation of a collective bargaining agreement, Allied, the seller, did not require the purchaser to assume its obligations to provide benefits to retired miners. The collective bargaining agreement expired following the sale of the mines. The purchaser was not liable for the benefits because it specifically contracted with Allied not to assume the obligations. Allied, like CF & I, was not a party to collective bargaining agreements executed by the purchaser following the sale. There is no indication in *Allied II* that the purchaser and the union had agreed [20] to allow Allied and the purchaser to allocate liabilities, rather than require Allied to comply with the terms of the collective bargaining agreement, as occurred in the case at bar. Allied continued to provide benefits to the retirees for almost sixteen months after execution of the new collective bargaining agreement to which it was not a party. The Trustees of the 1974 Benefit Plan found that Allied was "no longer in business", but that the purchasers were "successors", therefore the 1974 Benefit Plan could not pay benefits to retired miners.

The Fourth Circuit concluded that no party had a duty to provide the retired miners with the disputed benefits since: 1) Allied's contractual obligation had expired, 2) the purchasers' had agreed they would not assume the obligation to pay benefits to Allied's retirees, and 3) the 1974 Benefit Plan could not pay when a successor existed. However, the Circuit found that Allied's conduct was a breach of contract and focused on the damages to the retirees and an appropriate remedy for Allied's breach while the contract was still operative, applying the federal common law of collective bargaining as directed by *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) and its progeny.

The court in *Allied II* noted that it was "obvious" that the UMWA would have insisted that the purchaser bargain concerning the continuation of the disputed coverage in succeeding contract talks. Therefore, *Allied II* concluded that the retirees very probably would have been covered by the purchasers until the expiration of the 1984 contract and thereafter as long as those corporations or their successors were in the business of mining coal and employing union coal miners. The Fourth Circuit required Allied to provide benefits to the retired miners until it secured agreements from the purchasers to assume the obligations.

The Tenth Circuit found a different time period for measuring damages in *International Brotherhood of Electrical Workers, Local No. 12 v. A–1 Electric Service, Inc.*, 535 F.2d 1, (10th Cir.), cert. denied, 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976).[21] In *A–1 Electric Service* the Tenth Circuit considered the alleged inadequacy in the amount of damages awarded from the breach of a collective bargaining agreement in an action brought under the Labor Management Relations Act, § 301(a). Citing to *Lincoln Mills*, the Tenth Circuit decided that each remedy should be designed to promote the underlying policies of the Labor Management Relations Act, and that it would apply general contract law to effectuate those policies. A proper remedy would be to place the plaintiffs in the position they would have attained had the contract been performed.

After finding the proper measure of damages, the Tenth Circuit turned to the proper period for measuring the damages. It found damages calculated from the date the union withdrew its members because of the breach of the employer, or the date of filing of the complaint, unworkable. Instead the period the Tenth Circuit selected was the end of the contractual year, finding in accord with the general rule in breach of contract cases that the defendant is liable for all damages resulting from the breach that could have been

---

**20.** The *Allied I* decision notes, however, that the union plaintiffs were at least aware that Allied and the purchaser had allocated liabilities to require that Allied provide the benefits. The court charged the plaintiffs with knowledge of Article I and of the duration of the 1978 Wage Agreement stating, "[i]f plaintiffs relied on Allied's conduct or statements such reliance was

not reasonable in light of plaintiffs' knowledge of the provisions of the 1978 Wage Agreement." *Allied I*, 735 F.2d at 130.

**21.** *A–1 Electric Service* was cited favorably in *Allied I*. *Allied II* did not cite nor distinguish *A–1 Electric Service*.

reasonably and fairly contemplated by the parties at the time of execution. The court found "[i]t was foreseeable in the instant case that if the collective bargaining agreement were breached, that damages would accrue for at least the remainder of the contractual period." *A–1 Electric Service*, 535 F.2d at 4. *See Aguinaga v. United Food & Commercial Workers International Union*, 993 F.2d 1463, 1478–79 (10th Cir.1993) (In a suit based on the Labor Management Relations Act, § 301, 29 U.S.C. § 185, filed by an employee against his employer and union, the court found the likelihood of plaintiff's future employment beyond the expiration of the master agreement was strong, absent the employer's sham closing and the union's breach. The court distinguished its prior holding in *A–1 Electric Service* because *A–1 Electric Service* was not a hybrid § 301 case.), *petition for cert. filed*, 62 U.S.L.W. 3378 (U.S. Nov. 15, 1993) (No. 93–769); *Trustees of the Teamsters Construction Workers Local No. 13, Health and Welfare Trust Fund for Colorado v. Hawg N Action, Inc.*, 651 F.2d 1384, 1386–87 (10th Cir.1981) (citing *A–1 Electric Service* for the proposition that compensatory damages for breach should be such as will place the injured party in the same financial position in which he would have been had the contract not been breached), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1433, 71 L.Ed.2d 652 (1982).

Both the Fourth and Tenth Circuits attempted to foresee what damages could reasonably and fairly have been contemplated at the time of the breach. However, *Allied II* reviewed subsequent events and based its ruling on the determination that coal operators for many years agreed to pay health benefits to miners, and that it is "obvious" that the UMWA would have insisted that bargaining concerning the continuation of that coverage would occur. Therefore, the court concluded that retirees very probably would have been covered as long as the employers were engaged in the coal mining business.

 However, retiree benefits are not a mandatory bargaining subject. *Allied Chemical & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 179, 92 S.Ct. 383, 398, 30 L.Ed.2d 341 (1971) (having once found it advantageous to bargain for improvements in pensioners' benefits, active workers are not forever thereafter bound to that view or obligated to negotiate in behalf of retirees again, and since retirees are not members of the bargaining unit, the bargaining agent is under no statutory duty to represent them in negotiations with the employer). Retiree benefits are not terms or conditions of employment subject to the bargaining requirements of 29 U.S.C. § 158(d). Although retiree benefits may be anticipated to be the subject of future collective bargaining between the UMWA and Wyoming Fuel, it is not reasonably foreseeable at the time of the breach that Wyoming Fuel would agree to provide Non–Pension Benefits to Retirees that had never worked for Wyoming Fuel. Nor is it unforeseeable at the time of the breach that active workers might decide that current income is preferable to greater certainty in their own retirement benefits. "By advancing pensioners' interests now, active employees, therefore, have no assurance that they will be the beneficiaries of similar representation when they retire." *Allied Chemical & Alkali Workers*, 404 U.S. at 182, 92 S.Ct. at 399; *see also Merk v. Jewel Companies, Inc.*, 848 F.2d 761, 763 (7th Cir.), *cert. denied*, 488 U.S. 956, 109 S.Ct. 393, 102 L.Ed.2d 382 (1988).

It is also reasonable to assume at the time of the breach that CF & I anticipated that the lifetime Non–Pension Benefits referred to in the 1981 UMWA Agreement would be provided by others after the term of the 1981 UMWA Agreement expired. In the context of determining whether an operator could have foreseen the potential inability of the 1974 Benefit Plan to continue to support the financial burdens of providing Non–Pension Benefits to Retirees once many operators withdrew, the Court in *LTV Steel Company v. Shalala (In re Chateaugay Corp.)*, 163 B.R. 955 (S.D.N.Y.1993), indicated "LTV might well have expected that other coal operators would be required to pay for those benefits after LTV left the coal mining industry [as well as the potential insolvency of the 1974 Benefit Trust]". *Shalala*, 163 B.R. at 962–63.

Therefore, as applied to the facts of this case, the reasoning set forth in *A–1 Electric Service* is not only current and controlling on this court, but a more logical interpretation of what was reasonably foreseeable at the time of the breach. It places the parties in the position they could have attained had the contract been performed. Non–Pension Benefits would be paid to Retirees during the term of the 1981 UMWA Agreement as originally contracted. It also encourages the enforcement of collective bargaining agreements because it does not allow a windfall to CF & I by not paying Non–Pension Benefits as it had originally contracted. This court follows the rationale set forth in *A–1 Electric Service* rather than the expansive interpretation set forth in *Allied II.* The appropriate period CF & I would have been liable to pay damages for failing to require Wyoming Fuel to assume the Non–Pension Benefits would have terminated at the end of the 1981 Agreement.

## B. CF & I DID NOT HAVE RETIREE BENEFITS AS CONTEMPLATED IN 11 U.S.C. § 1114 AS OF THE DATE OF FILING

■ Section 1114(e)(1) of the Bankruptcy Code provides that a debtor in possession shall timely pay and shall not modify any retiree benefits of a plan in effect at the time of the declaration of bankruptcy, unless the court has ordered modification of such payments or the retirees' representative has agreed to modification. This section would be applicable in this case only if CF & I had retiree benefits that it was obligated to pay when it filed its petition under Chapter 11. As previously discussed, CF & I did not enter bankruptcy with an enforceable contractual obligation to provide Non–Pension Benefits to these Retirees. CF & I's obligation arising from the payments required under the equitable remedy provided by federal common law had been satisfied prior to the bankruptcy filing at the termination of the 1981 UMWA Agreement.

■ The Second Circuit in *LTV Steel Company, Inc. v. United Mine Workers of America (In re Chateaugay)*, 945 F.2d 1205, 1210 (2nd Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992), ruled that "it uniformly has been held that an employer is not legally responsible for the provisions of retiree health benefits after expiration of a wage agreement". Under the definition of "retiree benefits" applied by the courts in *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 519 n. 4 (Bankr.S.D.N.Y.1991) and *In re Doskocil Companies, Inc.*, 130 B.R. 870, 876 (Bankr.D.Kan.1991), § 1114 does not protect retiree benefits beyond the contractual obligations of the debtor.

■ The Bankruptcy Code does not create new rights upon filing bankruptcy that were not in existence prior to filing. *In re Federated Department Stores*, 132 B.R. 572, 574 (Bankr.S.D.Ohio 1991) (citing *Doskocil*, 130 B.R. 870, and *LTV Steel Co. v. Connors (In re Chateaugay)*, 111 B.R. 399 (S.D.N.Y. 1990) for the proposition that expiration of old contract rights involving retiree benefits may operate to short-circuit the modification processes provided in § 1114); *Roland v. Johnson (In re Johnson)*, 120 B.R. 461 (Bankr.N.D.Ind.1990) (§ 1129(a)(13) creates no new substantive rights to benefit prepetition retirees). Therefore the Plan of Reorganization, as confirmed, did not impermissibly alter or modify rights prohibited by § 1114.

## C. THE 1974 BENEFIT PLAN WAS LIABLE FOR NON–PENSION BENEFITS AFTER THE TERMINATION OF THE 1981 UMWA AGREEMENT

■ Employers who are signatories to various wage agreements assume the primary liability for Non–Pension Benefits to Retirees. The obligation continues until the termination of the wage agreement. If the UMWA was unable to negotiate a renewal of a wage agreement after termination and the employer ceased to provide Non–Pension Benefits for Retirees, the 1974 Benefit Plan was obligated to assume responsibility. The intent was that the 1974 Benefit Plan would provide a safety net of Non–Pension Benefits to Retirees if a former employer had no legal obligation to do so.

If a wage agreement remained in effect, the 1974 Benefit Plan's obligation was more limited, arising only when a covered Retiree

would otherwise cease to receive benefits because the last signatory employer for whom the Retiree worked and any successor or assign of that employer was no longer in business. "No longer in business" was described in the 1981 UMWA Agreement to include an employer that had ceased all mining operations and employing persons under the 1981 UMWA Agreement, with no reasonable expectations the operations would start up again, and was financially unable to provide Non–Pension Benefits. The terms "no longer in business" and "successor" were further defined by the 1974 Benefit Plan's trustees in 1978 using a two-part test. One definition, not applicable here, included a company that explicitly assumed liability for Non–Pension Benefits of the predecessor employer's retirees. The second definition involved a transfer of operations during the term of an employer's Wage Agreement without an accompanying transfer and assumption of retiree benefit obligations, and employed a five-part test. (See footnote 18). If the purchasing company satisfied this definition, the 1974 Benefit Plan was not liable for Non–Pension Benefits to the seller's retirees.

The 1981 UMWA Agreement indicated that the 1974 Benefit Plan provides Non–Pension Benefits to retired miners who would not receive benefits because their employer is no longer in business. The term "no longer in business" as defined by the 1974 Benefit Plan guidelines is when the company had notified the 1974 Benefit Plan in writing that it was no longer in business and would not resume operations, and had not received income from the production or sale of coal for at least six months. The facts of this case show that CF & I did not receive income from the production or sale of coal after closure of the Mines.[22]

■ When a former employer has no obligation to provide Non–Pension Benefits, the 1974 Benefit Plan remains legally obligated to provide Non–Pension Benefits to orphaned retirees after the expiration of the last labor agreement signed by a former employer or its successor. *UMWA v. Nobel,* 720 F.Supp. 1169, 1181–84 (W.D.Pa.1989), *aff'd,* 902 F.2d 1558 (3rd Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991). *Nobel* decided whether a solvent employer who was no longer contractually obligated to pay Non–Pension Benefits was required to continue to pay such benefits or whether the 1974 Benefit Plan was liable. Citing *District 17, United Mine Workers of America v. Allied Corp. (Allied I),* 735 F.2d 121, 133 (4th Cir.1984), *rev'd on reh'g en banc,* 765 F.2d 412, *cert. denied,* 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985), as an issue in negotiations for the 1984 Agreement between the Bituminous Coal Operators' Association Inc., and the UMWA, the court relied on subsequent cases[23] reaffirming the holding of *Allied I* that the obligation of the employer to provide benefits does not survive the expiration of the contract. The court found that there was no persuasive evidence of any intent to create a gap in coverage where an employer was not legally obligated to provide benefits. *Nobel* relied on *District 29, UMWA v. UMWA 1974 Benefit Plan and Trust (Royal II),* 826 F.2d 280 (4th Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988), and other cases, in concluding that "[w]ithout exception, the authorities interpreted the agreements and plan documents to impose the obligation to provide benefits on the 1974 Benefit Plan, and that the employer was no longer obligated to provide benefits after the expiration of the agreement.... therefore the financial status of these employers is simply irrelevant to a determination of health benefit entitlement." *Nobel,* 720 F.Supp. at 1179–80; *Grubbs v. UMWA,* 723 F.Supp. 123, 124–27 (W.D.Ark. 1989) (finding no support for the contention that pensioners purposely agreed to divest themselves of vested pension rights in favor of a scheme that would condition their re-

**22.** Under ERISA, section 4203(a), "a complete withdrawal from a multiemployer plan occurs when an employer ... (2) permanently ceases all covered operations under the plan." Withdrawal triggers withdrawal liability to the plan. CF & I was assessed and paid substantial penalties as a result of its withdrawal from the plan.

**23.** *District 29, UMWA v. Royal Coal Company (Royal I),* 768 F.2d 588 (4th Cir.1985); *District 17, UMWA v. Allied Corp. (Allied II),* 765 F.2d 412 (4th Cir.), *cert. denied,* 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985); *Box v. Coalite, Inc.,* 643 F.Supp. 709 (N.D.Ala.1986).

ceipt of pension benefits upon the financial condition of bankrupt employer whose assets exceeded its liabilities, but who was no longer legally obligated to pay benefits because the 1978 Wage Agreement had expired); *Schifano v. UMWA 1974 Benefit Plan & Trust,* 655 F.Supp. 200 (N.D.W.Va.1987) (where employers have no continuing obligation to provide Non–Pension Benefits, the trust must provide them). Similarly in this case, CF & I has no contractual obligation to provide the Non–Pension Benefits. CF & I also has no continuing obligation to provide Non–Pension Benefits based on damages after the expiration of the 1981 UMWA Agreement.

■ The remaining issue.is whether the 1974 Benefit Plan is not obligated to provide Non–Pension Benefits because Wyoming Fuel is a successor. The Fourth Circuit resolved that issues when, in *Royal II,* it addressed the issues of whether the 1974 Benefit Plan must provide health benefits where "[i]t is clear that neither the former employer nor its corporate successor is legally liable for providing these health benefits." *Royal II,* 826 F.2d at 283. The Court noted that the failure to anticipate the separation of financial ability and legal obligation in the definition of "in business," had resulted in a failure to comply with the intent to ensure coverage for all retirees.

> The 1974 Benefit Plan and Trust was established and continued in order to supply the health benefit needs of "orphaned" retirees, and thus construing the contract to impose that obligation on the trust fund, when the legal obligations of the former employer have terminated, can only further the purposes for which the trust fund was created.

*Royal II,* 826 F.2d at 283.

In this case, the result is the same. Wyoming Fuel is not legally obligated to provide benefits because it did not assume the liability under the Sale Agreement or under the 1983 Memorandum of Understanding. Since Wyoming Fuel, even if it is a successor, is not contractually obligated to provide Non–Pension Benefits, the retirees are orphaned from Wyoming Fuel. Since CF & I is neither obligated contractually, nor as a result of damages owing as a remedy for breach of contract since the 1981 UMWA Agreement has terminated, the retirees are orphaned from CF & I.

■ The Combined Fund finds these cases inapplicable because CF & I continued to provide benefits until October of 1992. It asserts that it is liable only if CF & I or Wyoming Fuel cease to have a legal or contractual obligation to provide Non–Pension Benefits *and actually cease to provide those benefits.* However, the language in Article 20, § (c)(ii) indicates that the 1974 Benefit Plan provides benefits to any retired miner "who would otherwise cease to receive" benefits. The Combined Fund interprets the provision instead to imply that the Retiree has already ceased to receive the benefits. Such an interpretation would require gaps in coverage that would defeat the purpose of the provision. The Combined Fund criticizes CF & I's failure to explain why it provided payment when it was not obligated to do so. However, the fact that CF & I gratuitously paid Non–Pension Benefits for years when it was not legally or contractually obligated to do so, has no impact on the legal obligations of the 1974 Benefit Fund as set forth in the contract and interpreted in the case law.

As stated by the Second Circuit in *Chateaugay:*

> Here the retired employees are guaranteed provision of health benefits for life under the collective bargaining agreement. That agreement has been interpreted to mean that if the Wage Agreement terminates, the benefits are still provided but they are provided by the Benefit Trust, instead of by the companies. The Mining Companies ceased operations in 1986. The 1984 Wage Agreement expired in 1988. Upon its expiration, the burden for the provision of retiree health benefits shifted to the Benefit Trust. There is no cessation of benefits; there is no termination of benefits. Whether the plan is able to fund fully the benefits is a separate issue. The retired employees are receiving exactly what they bargained for in the 1984 Wage Agreement.

*Chateaugay,* 945 F.2d at 1210. Under the rationale of *Nobel* and *Royal II,* the 1974

Benefit Plan is liable for Non–Pension Benefits to Retirees, the purpose for which it was created, after CF & I's legal obligation to provide such benefits terminated at the expiration of the 1981 UMWA Agreement.

### D. AVOIDANCE OF TRANSFERS UNDER 11 U.S.C. § 548 AND § 549

 CF & I's third and fourth causes of action relate to avoidance by this estate of transfers of CF & I's assets made to the Retirees both before and after CF & I's bankruptcy filing. CF & I asserts the transfers were made on behalf of the 1974 Benefit Plan.

Sections 548(a)(2)(A) and (B) provide that the trustee may avoid any transfer of an interest of the debtor in property, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor received less than a reasonably equivalent value in exchange for such transfer, and the debtor was insolvent on the date that such transfer was made. CF & I's motion for partial summary judgment reserves the issue of insolvency. The elements related to the transfer of an interest of the debtor in property within one year before the date of filing the petition are not in dispute. The court has decided previously in this opinion that CF & I was neither contractually liable, nor liable as a remedy for damages, to pay Non–Pension Benefits to Retirees within one year before filing the Chapter 11 case. It has also decided that the 1974 Benefit Plan was obligated to provide such benefits. Consistent with the court's ruling regarding CF & I's lack of legal or contractual obligation to pay the Non–Pension Benefits, the element of CF & I's failure to receive a reasonably equivalent value in exchange for the transfer has been met. The payment to Retirees of approximately $300,000, constitutes a transfer within one year of filing for which CF & I received less than a reasonably equivalent value. The element of insolvency is not before this court on summary judgment. But for that element, all conditions to allow avoidance of the transfer under § 548 have been met.

Section 549 allows avoidance of postpetition transactions made after the commencement of the case that are not authorized under Title 11 or by the court. The Combined Fund argues that CF & I had a continuing requirement under § 1114 to pay Non–Pension Benefits to Retirees after the commencement of the case and therefore no recovery under § 549 is available. However, as discussed previously, CF & I had no legal obligation to pay Non–Pension Benefits to Retirees after the date of the filing of the Chapter 11 petition, and no court order exists that allowed such payments. Since there was no legal obligation that CF & I fulfilled, payment post-petition was inconsistent with CF & I's fiduciary duties as a debtor-in-possession. Section 549 allows avoidance of the transfer in order to allow recovery so as to return the funds to the estate for the benefit of all creditors. The court did not authorize the payment of approximately $500,000 to Retirees after the date of filing and CF & I had no legal obligation to make the payments. The transfers are therefore voidable pursuant to § 549.

### E. RECOVERY OF TRANSFERS UNDER 11 U.S.C. § 550

 Section 550(a)(1) allows recovery of property, or the value thereof, of a fraudulent conveyance under § 548 or a post-petition transfer under § 549, from the entity for whose benefit such transfer was made. The 1974 Benefit Plan was obligated to provide Non–Pension Benefits to Retirees within one year of filing and thereafter, but did not. Since CF & I transferred its property and paid the Non–Pension Benefits to Retirees, the 1974 Benefit Plan received a corresponding benefit. The 1974 Benefit Plan therefore qualifies as an entity for whose benefit the transfers were made as set forth in § 550(a)(1).

 The Combined Fund asserts that § 550(a)(1) requires that CF & I made the payments for the Non–Pension Benefits with the intent to benefit the 1974 Benefit Plan, or the Combined Fund, relying on *Merrill v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118, 128 n. 12 (D.Utah 1986). In *Clearing House*, the target under a § 548 action to recover $25,000 raised § 550(b)(1) as a defense. The District Court concurred

that the application of § 550(b)(1) was appropriate. In a footnote, the District Court interpreted § 550(a)(1) to mean that the phrase "or the entity for whose benefit such transfer was made" implies a requirement that, in transferring the avoided funds, the debtor must have been motivated by an intent to benefit the entity for whose benefit the transfer was made. Indeed, the District Court paraphrased the statute to read "the entity for whose benefit the transfers were intended." *Clearing House,* 62 B.R. at 127.

In *Manufacturers Hanover Leasing Corp. v. Lowrey (In re Robinson Brothers Drilling, Inc.),* 892 F.2d 850 (10th Cir.1989) (adopting 97 B.R. 77 (W.D.Okla.1988)), the Tenth Circuit rejected any requirement of a subjective "intent" to benefit a particular person by a transfer under the insider preference provision of § 547(b).

> Under the present case, for example, there is no evidence of bad faith associated with the payments by the debtor. However, because the transfer of money to Appellees serves to benefit the guarantor Hodges, who is an insider, the transfer is covered by the statutes, and is thus avoidable and recoverable.

*Robinson Drilling,* 97 B.R. at 83. In stressing the "plain language" of the statute, the Tenth Circuit underscored the premise that the statute should be read as it is written, and not rewritten to include additional elements that Congress could, but did not, include. *See also Billings v. Zions First National Bank (In re Granada Inc.),* 110 B.R. 548, 550-51 (Bankr.D.Utah 1990) (where the court did not address intent but indicated that the alleged transfers could be found to have benefited the insider-creditors because they reduced their potential exposure to liability and accordingly the facts as alleged were sufficient to state a claim under §§ 547(b) and 550(a) upon which relief could be granted, without requiring an element of intent).

▪▪▪ The final defense raised by the Combined Fund is that, even if the transfers are avoidable under §§ 548 and 549 and are recoverable under § 550, such recovery conflicts with ERISA, § 403, 29 U.S.C. § 1103(c)(1). ERISA, § 403 provides in part:

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

The Combined Fund asserts this provision prevents the relief sought in CF & I's complaint. ERISA is intended to act in harmony with and subordinate to *all* other federal law. 29 U.S.C. § 1144(d) states:

> Nothing in this title shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States ... or any rule or regulation issued under any such law.

ERISA does not supersede the provisions of § 550, but is intended to be harmonized with its provisions. Allowance of recovery will not benefit CF & I as prohibited by ERISA, but will benefit CF & I's creditors because the funds will be redistributed according to the provisions of the confirmed Plan of Reorganization. To rule otherwise would provide a windfall to the 1974 Benefit Plan at the expense of CF & I's creditors. Therefore, the transfers avoided under §§ 548 and 549 are recoverable from the 1974 Benefit Plan.

The parties have maintained throughout their memoranda and arguments that nothing in these motions for summary judgment are intended to require this court to interpret CIRHBA.[24] The Combined Fund, however, asserts that it succeeds to only part of the liabilities of the 1974 Benefit Plan. It indicates that it is responsible only where the 1974 Benefit Plan was obligated to pay, and was paying, Non-Pension Benefits to Retirees. The 1992 Benefit Plan provides benefits to eligible beneficiaries who, but for the enactment of CIRHBA, would be eligible to receive benefits from the 1974 Benefit Plan. Since the 1974 Benefit Plan has now merged

---

**24.** Other issues relating to the constitutionality of the CIRHBA have been alluded to, but not raised, in this proceeding. *See LTV Steel Company v. Shalala (In re Chateaugay Corp.),* 163 B.R. 955 (S.D.N.Y.1993).

into the Combined Fund pursuant to CIRHBA, § 9702(a)(2), liabilities of the 1974 Benefit Plan follow that merger. If CIRHBA provides an allocation of those responsibilities, that allocation has not been argued in the context of these motions for summary judgment. Since the parties have indicated that any interpretation of CIRHBA is outside the scope of this ruling that determines the relative obligations of the named parties, it will not do so.

## V. CONCLUSION

The court having decided the issues raised by each of the cross-motions for summary judgment as set forth above, it is hereby

**ORDERED,** that summary judgment in favor of CF & I is granted on its first cause of action declaring that CF & I is not liable to provide Non–Pension Benefits to Retirees after the date of the complaint, and that the 1974 Benefit Plan was obligated to make such payments pursuant to the 1981 UMWA Agreement, and it is further

**ORDERED,** that summary judgment in favor of CF & I is granted on its second cause of action declaring that CF & I has not been liable to provide Non–Pension Benefits to Retirees since at least December 31, 1985, the extended date the 1981 UMWA Agreement terminated, and that the 1974 Benefit Plan was so obligated, and it is further

**ORDERED,** that partial summary judgment in favor of CF & I is granted on its third cause of action concluding that CF & I has met all elements set forth in § 548 except insolvency and in § 550 entitling CF & I to recover from the 1974 Benefit Plan, or the entity statutorily liable as successor, the value of all amounts paid by CF & I for Non–Pension Benefits to Retirees for the one year period prior to November 7, 1990, and it is further

**ORDERED,** that summary judgment in favor of CF & I is granted on its fourth cause of action concluding that CF & I has met all elements set forth in § 549 and in § 550 entitling CF & I to recover from the 1974 Benefit Plan, or the entity statutorily liable as successor, the value of all amounts paid by CF & I for Non–Pension Benefits to

Retirees for the period subsequent to November 7, 1990, and it is further

**ORDERED,** that summary judgment is granted in favor of CF & I dismissing the UMWA's counterclaim, and it is further

**ORDERED,** that the relief sought in the Combined Fund's motion for summary judgment seeking an order declaring that the 1974 Benefit Plan is not liable for Non–Pension Benefits to Retirees, that CF & I remains liable, and that the 1974 Benefit Plan is not liable to CF & I for any amount expended to provide Non–Pension Benefits to Retirees, is denied, and it is further

**ORDERED,** that CF & I is directed to prepare a partial summary judgment in accord with this memorandum decision.